GILLETTE, Respondent, v. McLAUGHLIN, Executor, Appellant.

(184 N. W. 277.)

(File No. 4888.    Opinion filed August 31, 1921.    Decision modified
November 22, 1921.)

1. **Wills—Contest for Mental Unsoundness—Changing Benefit Certificate From Wife to Sister or Niece, One Name Mis-stated, Mistake of Scrivener, Whether Evidence of Incompetency.**

The fact that decedent at time of making his will changed the beneficiary in a $3000 benefit certificate held by him from his wife as beneficiary to his sister, "Flora Sheffield or Clara Louis Sheffield, sister and niece," the direction to change beneficiary being erroneous in writing the name as "Florence" instead of "Flora," is no evidence of mental weakness, especially since it is apparent from the handwriting on the certificate that it was written by another than decedent.

2. **Wills—Contest for Mental Unsoundness—Morose Disposition—Vicious Temper, Brutality to Wife, Children, Grief Over Deceased Son, Peculiar Look, Compelling Use of Run-away Horse, Destroying Tombstone, Subsequent Separation, Subseqent Decree of Separate Maintenance, Changing Benefit Certificate From Wife to Sister; Wife, Children, Beneficiaries Re Will, Bulk of Property to Solicitous Friends—Evidence Disproving Incompetency.**

Decedent, wife and children resided together for 22 years, a son having died two years before the wife took the children from the farm home to F, and never afterward returned, removing with children two years thereafter to M in an adjoining state where she has since resided; she soon thereafter procuring a decree against husband for separate maintenance, husband having complied therewith; decedent having soon thereafter sold his personalty and lived thereafter at various places; husband and wife owning two quarter sections, title to one being in him, the other in wife; a subsequent suit by him to quiet title in him to both quarters was still pending at his death, subsequently resulting in one quarter being awarded his estate, the other to the wife; he subsequently working on different farms, being finally in charge of a cream station, still later joining U. S. Army, enlisting as single and of 34 years, while in fact he was 62; his health having failed and being discharged from Army he returned to F, going to the home of one M, with whom he had been acquainted for years, a warm friendship having arisen between him and M and wife, frequently visiting them and working for M and being strongly welcomed by them into their home and having been visited by M and wife while a sick soldier. He was soon taken to a hospital in F, where he made a will, giving to his three children

(who since the separation had lived with the mother and seemed to have no regard for him) $100 each, to his wife a one-third interest in the two quarters provided court should award it all to him, but in case any part of it was awarded wife then she to have no interest in the part awarded him; to the Catholic Church at F $100 for masses; to M $5000, the residue to the Catholic Church in F; M being named executor. **Held,** the evidence fails to show testator mentally incompetent to make a valid will; this against contention that he was of unsound mind, mentally weak and laboring under mental delusion and unable to understand nature of the instrument or his obligation to wife and children; evidence showing that loss of his oldest son 20 years after the marriage caused him great grief; that he subsequently tore down the monument over his son's grave, broke it up and threw the pieces into the river; that, being the holder of a $3000 benefit certificate naming his wife as beneficiary, he when executing the will undertook to change beneficiary and make it payable to his sister F S or to C L S, sister and niece; that the testimony falls far short of proving decedent insane or mentally incompetent; the evidence showing he managed his affairs as well as the average man; nor was there proof as to whether provocation led to his abuse; that in suit for separate maintenance children took sides with mother and testified against him; that the M family always afforded him an asylum when he seemed friendless and alone.

3. **Wills—Contest on Ground of Fraud, Undue Influence of Main Devisee and Priest Legatee—Beneficiaries' Friendship, Solicitude, Protecting in Their Home, Non-evidence of Undue Influence.**

The fact that M, a non-relative but made chief beneficiary in decedent's will, had together with his wife for some years been very friendly toward him, had at times welcomed him to their home, visited him frequently while at a hospital, and that M stayed with him the night before the will was made; that Father K, a Catholic priest at F where decedent was living, frequently called upon him at the hospital, and on one occasion took his confession and administered Holy Communion and that the Catholic church congregation in F was made residuary legatee and M was named as executor; no evidence existing that either beneficiary tried to influence him in any manner in regard to disposition of his property or even knew he intended to make a will;—fails to establish that the will was the result of fraud and undue influence.

4. **Appeals—Error—Residuary Clause in Will, Indefiniteness— Pleadings, Evidence, Not Involved—No Issue on Appeal.**

The question whether a residuary clause in a will is too in-

definite and uncertain, not having been raised by pleadings or evidence, will not be considered on appeal.

Appeal from Circuit Court, Moody County. Hon. Louis L. Fleeger, Judge.

In the Matter of the Will of James · A. Gillette, deceased. Orrie Gillette, widow of decedent, contested the will in the county court, that court having admitted the will to probate; from which decree contestant appealed to circuit court; which latter court on trial to jury adjudged the will void; from which judgment and from an order denying a new trial, William J. McLaughlin, Executor under the will, appealed. Reversed.

*Frederick A. Warren,* and *Bates, Johnson & Simons,* for Appellant.

*Rice & Rice,* and *Brady, Robertson & Bonner,* for Respondent.

(2) To point two of the opinion, Appellant cited: Hackett v. Hackett, 33 S. D. 208; Boll v. Strand (S. D.) 178 N. W. 880.

POLLEY, P. J. This appeal grows out of a controversy over a will. James A. Gillette, the decedent named herein, died testate on the 18th day of July, 1918. He left surviving him as heirs at law his widow, Maggie 'A'. Gillette; a daughter, Elizabeth; and two sons, Orrie Gillette, the plaintiff in this action, and John A. Gillette. There had been an older son, Harry, who was killed by falling from a load of hay on the 1st day of September, 1910. Decedent and Maggie Gillette were married on the 1st day of January, 1890. They lived together on a farm in Moody county from the time of their marriage until about the 1st of October, 1912, when Maggie Gillette, during the absence of decedent and without his knowledge or consent, took the children and moved into a house in Flandreau, and never after returned to the farm or lived with decedent. She remained in Flandreau about 2 years, when she took the children and moved to Minneapolis, where she has since resided. During the year 1914 she commenced an action against decedent for separate maintenance. In that action she prevailed, and judgment was entered, requiring her husband to pay her $400 a year, and so far as the record shows this judgment was complied with. Not long after Maggie Gillette left the farm decedent had · a sale and disposed of the personal property on the farm, and does not appear ever to have

lived upon or made his home on the farm thereafter. At the time Maggie Gillette left the farm they owned two quarter sections of land, title to one quarter of which was in decedent's name and the other in his wife's name. About the year 1916, decedent commenced an action against Maggie Gillette to have title to both quarter sections quieted in his name. That action was still pending at the time of his death, but the final result of the suit was that title to one quarter was awarded to him, or rather to his estate, and the other to his wife. At the time of his death this land was worth about $100 per acre. After decedent left his farm he worked about on different farms, also in a cream station in Flandreau, and finally had charge of a cream station at Elkton. In February, 1918, he entered the United States army. He enlisted as a single man, 34 years old, although at that time he was past 62 years of age and had a wife and grown family. He was sent to Jefferson Barracks, but in a short time his health broke down, and he was placed in a government hospital, where for a time he was very sick. He partly recovered, but was discharged from the army because of poor health, and returned to Flandreau about the last of June, 1918.

Some time during the year 1913 decedent made the acquaintance of the defendant, William McLaughlin, and a warm friendship sprang up between McLaughlin and his wife and decedent. Decedent worked for McLaughlin at different times, and McLaughlin transacted some business for decedent. When decedent was in the neighborhood he appears to have frequently visited the McLaughlins. He appears to have been welcome and to have been made to feel at home; in fact for the last 4 or 5 years of his lifetime the McLaughlin home came nearer to being a home for him than any other place. While he was sick in the hospital at Jefferson Barracks he telegraphed to McLaughlin to come to him. Upon receipt of this message McLaughlin and his wife both went to see him. They had a son in the government service stationed at East St. Louis, and they went to see him on the same trip; but after visiting their son they went back and visited decedent again before they returned to Flandreau. When decedent returned to Flandreau about the last day of June he went directly to the McLaughlin home, where he remained some three or four days, when he was taken to a hospital in Flandreau. From that

time on he failed rapidly.   On the 12th day of July he sent for a banker in Flandreau, with whom he had done business, to come and draw his will.   By the terms of this will he disposed of his property as follows:   To his three children he gave $100 each. To his wife he gave a one-third interest in the two quarter sections of land above mentioned, provided the court should award it all to him, but in case any part of the land was awarded to his wife, then she was to have no interest in the part awarded to him.   He directed his executor to expend $500 for a monument to be placed on the family burial lot in the cemetery in Flandreau. To the Catholic Church in Flandreau he gave $100 for masses; to defendant McLaughlin, $5,000; the residue to the congregation of the Catholic Church in Flandreau; and the said McLaughlin was named as executor.   Decedent was unable to leave his bed when the will was made.   He continued to grow weaker until the 18th day of July, when he died in a hospital in Dell Rapids, to which place he had been taken on the 14th of July.

It is alleged in plaintiff's petition that the will is void and should be canceled, because at the time the will was executed testator was not mentally competent to make a valid will, and because the said will was made as the result of the fraud and undue influence of the said McLaughlin and one George E. Kelly, a Catholic priest in charge of the Catholic Church in Flandreau.

Numerous questions are presented by the record, but under the view we take of the case it is necessary to consider only the questions of mental competency and undue influence.

It is claimed by plaintiff that at the time of the execution of the will testator was of unsound mind, was mentally weak, and laboring under mental delusion, and that he was unable to understand the nature of the instrument he executed, or his obligations to his wife and children.

Upon the question of decedent's mental condition it is claimed and fairly proved that testator was a man with a morose disposition; that he had a vicious temper; that he was unkind and sometimes brutally cruel to his wife and children; that the loss of his oldest son in 1910 caused him great grief; and that for some time thereafter his mind seems to have been deranged.   Upon the subject of his mental condition, his wife testified that—

At times he would sit "in a deep study and watched us and

watched every move we made around the house, and I was terribly frightened. Sometimes he would just simply do that, and I would get up and go out of the house, and again he would fly in a rage and grab hold of anything he could, and looked like an insane man, watching you with that peculiar look. Sometimes he would go for weeks and be all right, and again he would take spells and wouldn't be all right. He seemed to be in a deep study over something. He would send the children to school with a horse that wasn't safe. It ran away a number of times, and a number of times it threw them out, and finally they quit driving the horse and walked. He wouldn't let them have anything else to drive. The horse ran away Decoration Day in 1911. It threw Elizabeth and I out and hurt us, and the man in the feed barn told us not to hitch it up for several days, and the next day Elizabeth wanted to drive to school, and Orrie was going to hitch up for her, and he forbid him, and she didn't have time to walk. It was seven miles. He had a very unbalanced mind. He was not of sound mind.

"When the tombstone came he wouldn't allow it to be put up. After the boy was buried there I had a curb put up around the lot, and had Harry's initials put in the corner of the curb, and when I went out a month later the corner with the initials was knocked out of the curb. I had planted some rose bushes, and they were torn out. There was a monument erected on the grave in 1911. It was afterwards removed from the lot. Yesterday I didn't mean to say he was insane because he enlisted. I meant to say when Mr. Gillette entered the service to swear his age the way he did, and that he was a single man, and take $10,000 at the risk of the government put on it is what I meant. We came home from church one Sunday, and he came. I finished dinner before the others did, and I went in the living room and sat down and took a paper to read. Elizabeth was the last one to finish. She got up shortly, and came in where I was, and when he finished he took a chair and threw at her with such force that he broke the chair. There was not a word of disturbance. It was after the boy's death in 1911. When I saw my husband at Flandreau after leaving him and at Minneapolis our relations were friendly. The last 2 years he had sullen spells. He wouldn't speak to any one, and I can't describe the look on his face. It

was a peculiar look, an insane look, as if he was watching every move you made and you were afraid he would spring at you."

Upon this same subject Lizzie, the daughter, testified as follows:

"Sometimes he would strike her [meaning his wife] with his hand or fists. Sometimes he would give her a kick, if that was more convenient. One time I saw him beat her with a buggy whip. I think she fainted and fell down, and he beat her after she lay on the ground. At one time I had gone to bed in the evening and I woke up and heard my mother crying and talking and pounding on the door. I heard my father talking. I crawled to the door and he had the door locked, and the ax was leaning up against the door jamb. He had my mother locked out. I was afraid to say anything. My first recollection is of seeing him place the ax against the door jamb. He was stading by the door."

All of these acts, except possibly the removal of the monument from the son's grave, took place prior to the separation of decedent and his wife in 1912. Decedent tore the monument down, broke it to pieces, and hauled the pieces away and threw them in the Big Sioux river. It is not clear from the testimony set out in the printed record whether the monument was removed in 1911 or in 1917.

[1] The deceased was the holder of a $3,000 benefit certificate in the Modern Woodmen of America, which certificate named his wife as beneficiary. On the day of the execution of the will he undertook to change the beneficiary and make it payable to his sister, "Flora Sheffield" or "Clara Louise Sheffield, sister and niece." But in making out the direction to change the beneficiary the name is written as "Florence" Sheffield, instead of "Flora." This fact is urged as evidence of mental weakness at the time of the execution of the will. This, however, is of very slight consequence, because it is apparent from the handwriting on this certificate that it was not written by decedent, and the mistake may have been made by another party than him.

The above testimony touching the conduct of decedent is not disputed, and no doubt it is all true; but it falls far short of proving that decedent was insane or mentally incompetent on the 12th day of July, 1918. During all the period from October,

1912, until February, 1918, decedent was in and about Flandreau and Elkton. He worked on various farms and in the cream station at Flandreau; and at Elkton he had charge of a cream station. He attended to the business incident to the operation, renting and caring for his farm. Yet during all this time no act of his is shown that any one, including the members of his own family, considered indicative of a deranged mind or mental weakness. He appears to have managed his affairs as well as the average man. No doubt he was cursed with a mean, ugly, overbearing disposition, but this seems to have been exercised only toward members of his own family. What, if any, provocation he may have had does not appear, nor would any amount of provocation justify his conduct. But conceding all this, it does not prove nor tend to prove lack of mental capacity to manage and dispose of his property. He did not overlook any member of his family when he made his will. True, he virtually disinherited all of his children, and in view of their relations this might have been expected. When his wife left him the children all went with their mother. When she sued him for separate maintenance they all took sides with their mother, and testified against him in court. While their loyalty to their mother is commendable, their father regarded them as unjust and unfair and ungrateful, and certain it is that so far as the record shows neither of the children ever showed him the slightest regard or respect, or showed the slightest concern for his welfare. On the other hand, the McLaughlin family was always kind to him, and afforded him an asylum when he seemed to be friendless and alone. He was made to feel at home at McLaughlin's, and was at liberty to come and go at will. When he was sick and among strangers at Jefferson Barracks it was to them he turned for friendship and consolation, and they responded. When he was discharged from the government hospital it was the McLaughlins who opened their home to him, and where he might have stayed indefinitely had it not been necessary that he be taken to the hospital. And it was the McLaughlins more than any one else who looked after his needs and comfort while he was in the hospital. What more natural thing was there to do than remember them in his will?

But in the face of all these circumstances decedent did not fail to make some provision in his will for his family. The evi-

dence shows that he was claiming property valued at about $30,-000. Whether he owned it all or half of it belonged to his wife was a matter then pending in court. If the court awarded it all to him, then by the terms of the will one-third of it all was to go to his wife. If the court awarded her one-half the property, then he considered that she was provided for, and she was to have no part of the half that was awarded to him.

[2] After a careful consideration of this entire record, we fail to find any evidence sufficient to go to the jury on the issue of mental incompetency. Respondent cites and relies on Johnson v. Shaver, 41 S. D. 585, 172 N. W. 676, in support of the verdict in this case, but the circumstances under which the will in that case was made are so wholly unlike the circumstances surrounding the execution of the will in this case that that decision is not controlling in this case. As was said in this court in Re Boll's Estate, 178 N. W. 880:

"There is absolutely no proof of hallucinations nor proof of anything indicating continual mental incapacity on the part of deceased."

[3] Upon the question of undue influence the evidence is even more meager than upon the other. It is claimed that the testator was unduly influenced in the making of the will by the said William McLaughlin and George E. Kelly, who at the time of the execution of the will was the priest in charge of the Catholic Church at Flandreau. The evidence shows that decedent was on terms of intimate friendship with both of these parties, both of them had some opportunity to take advantage of their friendship and the confidential relations that existed to influence decedent, and both are beneficiaries under the will. But the evidence goes no further. Decedent was at McLaughlin's house several days before he went to the hospital. Both McLaughlin and his wife went to see decedent a number of times while he was in the hospital, and McLaughlin stayed with decedent all of the night before the will was made. Father Kelly also called on decedent several times while he was in the hospital, and on one of these occasions took decedent's confession and administered the holy communion. But there is no evidence of any kind whatever that either of these parties ever tried to influence him in any manner in regard to the disposition of his property, or talked with him about making a

will, or knew he intended to make a will, or knew that he had made a will, until after he was dead. That they had an opportunity to talk with him and possibly to influence him cannot be questioned, but opportunity alone, or opportunity together with the fact that they were provided for in the will, does not amount to legal proof that they were instrumental in bringing about the disposition made of his property. McKenzie v. Murray, 183 N. W. 736.

[4] It is contended by contestant that the residuary clause in the will is so indefinite and uncertain that it cannot be ascertained who the intended beneficiary is. This question was not raised by the pleadings nor presented by the evidence. It was not passed on by the trial court, and cannot be raised here for the first time.

There being no sufficient evidence to support the verdict, the judgment and order appealed from are reversed.

WHITING, J., not sitting.