ARMSTRONG, Respondent, v. ARMSTRONG et al, Appellants.
ARMSTRONG, Respondent, v. TRYGSTAD, Appellant.

(272 N. W. 799)

.(File No. 7909. Opinion filed April 21, 1937)

234

*C. O. Trygstad* and *B. H. Schaphorst,* both of Brookings, for Appellants.

*Philo Hall,* of Brookings, for Respondent.

RUDOLPH, P. J., This is an appeal from the circuit court of Kingsbury county, and involves the validity of what purports to be the last will and testament of Josephine Armstrong, deceased. The decedent died in the town of Arlington on the 8th day of March, 1932. She left surviving her as her heirs at law a son, Milton Earl Armstrong, aged 55 years; a second son, Charles Herbert Armstrong, 53 years of age; and a married daughter, Maude Clare Vestal, 44 years of age all of whom resided in Arlington, S. D.

The will involved was executed on the 3d day of November, 1930. The portions of the will involved on this appeal read as follows:

"After the payment of such funeral expenses and debts, I give, devise and bequeath unto my son Milton Earl Armstrong and my daughter Maude Clare Vestal all of my real estate in the following proportions: To my said son, the two-thirds of all my real estate, and to my said daughter one-third of all my real estate, and I give and bequeath all of my personal property in equal shares unto my said son Milton Earl Armstrong and my said daughter Maude Clare Vestal.

"I do not by this will give anything to my son Charles Herbert Armstrong for the reason that I have heretofore given him property and money and I intentionally refrain from giving him anything in this will."

On the 7th day of April, 1932, the will was presented to the county court for probate, whereupon Charles Herbert filed a protest. The protest was based upon the claim that at the time of the execution of the will the decedent was "subjected to fraud and undue influence, duress, and menace by the beneficiaries named in the will and that they by false and fraudulent statements and conduct persuaded the decedent to disinherit the contestant."

A trial took place in the county court on the issues raised by the protest. Findings of fact, conclusions of law and judgment were for protestant, and the proponents, Milton and Maude, took an appeal to the circuit court. A transcript of the testimony taken in the county court was made, and, pursuant to stipulation by the parties to the contest, the case was tried by the circuit court on such transcript. This trial, like the one in the county court, re-

sulted in a judgment for the protestant, and the proponents have appealed to this court.

The record discloses substantially the following facts, which are not in dispute. The Armstrong family, consisting of the father, the mother, and the three children, lived on a farm in Kingsbury county. The family worked as a unit, and as a result of this work three additional quarter sections of land were acquired, title to which were taken in the name of Milton and Charles Herbert (who will be hereafter referred to as Bert). All of the children either worked on the farm or taught school, and a considerable portion of the earnings while teaching school went into the family account. The daughter Maude was first married about the year 1916 and lived away from the family home until after the death of her first husband, which occurred some time prior to April, 1919, when Maude and her two small children returned to the family home. After Maude returned with her children the family again lived as a unit in the home on the farm until the year 1921 at which time Bert who was then 46 years old, was married. Bert and his wife continued to reside on the farm and the rest of the family moved into a home in Arlington which was purchased and title taken in the name of Milton and Bert. Maude was married a second time in the fall of 1923 and again left the family home and remained away until September, 1924. This marriage was apparently contrary to the wishes of the mother, and shortly thereafter the mother made a will practically disinheriting Maude, which will remained in force until some time after Maude's return in 1924. In 1923 Bert and his family left the farm and moved into Arlington and lived in the house with Milton and the mother and father—Maude at the time being married and living with her husband. The father died in 1925. When Maude returned to the family home the second time she had in addition to her two boys by the first marriage a child as a result of the second marriage. When Bert and his wife moved into this home in Arlington they had two children, so in this house in Arlington there were living the mother and father, Milton, Maude, and her three children, and Bert, his wife, and their two children. Trouble arose in the family as described by Mrs. Bert Armstrong "between Bert and I on one hand and the Armstrongs on the other." This trouble reached the point that it

finally became necessary for Bert and his family to leave the home. A second home was purchased in Arlington and Bert and his family moved into this second home. However, the troubles continued until there was complete disagreement and discord between Bert and his family on one hand and the other members of the Armstrong family on the other. During all of this time Bert and Milton continued to carry a joint account in the bank and the business was conducted as a family business until about August, 1929, when Milton had the bank account divided between himself and Bert. In the spring of 1930 a serious altercation occurred between Bert and Milton. Milton had gone to the old farm owned by the mother and had taken some oats from the farm which had apparently been retained for seed. Bert disliked Milton's taking of these oats and in retaliation Bert took about 100 bushels of barley after the mother had told him "to leave the grain alone on her farm." As a result of this trouble over the barley and oats transaction Bert immediately started a partition action wherein he sought a division of the property held jointly by himself and Milton. This trouble never subsided, and it appears that members of the family could not talk with each other without arguments concerning the family affairs, which arguments always were heated and personal. The last time Mrs. Bert Armstrong saw Bert's mother was in June, 1929. Bert finally refused to even go to see his mother and did not attend her funeral, although he was there at the house and with her the day she died. Bert testified: "Sometimes I did get angry when I had these arguments with mother, the same as she did. We both became angry." It is without dispute in this record that the mother was a strong-willed person, and in spite of an illness which had rendered her a practical invalid for a good many years, nevertheless, she continued mentally active and asserted herself more or less as the head of the family. This is indicated by the arguments she had with Bert, her actions in connection with the second marriage of Maude, and was testified to by all disinterested persons, which testimony is without dispute in the record. For a good many years, as stated above, Mrs. Armstrong was a physical invalid. She was suffering from diabetes and neuritis. Mrs. Armstrong required two insulin treatments every day, and during much of the time was confined to a wheel chair and could not attend to many of her personal wants.

During all of these years it was Milton who looked after and cared for the mother. Maude helped to some extent, but it was in the main Milton who cared for Mrs. Armstrong. The will in dispute was executed on November 3, 1930. Mr. Trygstad, a lawyer, located in Brookings, called at the Armstrong home, and it was he who called Mr. Gullick, one of the subscribing witnesses, and asked his presence at the execution of this will. Milton called Doctor Grove, the other subscribing witness, and asked his presence in the Armstrong home without saying anything to Doctor Grove regarding the purpose of the visit. When the will was being executed Milton was not in the room, but was in an adjoining room and the doors were open. Mrs. Armstrong stated to Doctor Grove at this meeting wherein the will was being executed, "Oh, doctor, this is the hardest thing I ever did in my life. I am making my Will." The doctor testified that she cried at the moment she made this statement. A tenant on the Armstrong farm testified that in September before this will was executed "Mrs. Armstrong said Bert would get the same share as the others." Bert testified that subsequent to the execution of the will he told his mother and Milton that he had heard she had executed a will while he was in the hospital or words to that effect, and that both had told him that he was mistaken. When Bert finally came to see his mother on her deathbed, his mother said to him: "Bert, you came too late." It appears also that shortly before executing this will Mrs. Armstrong had changed the beneficiaries in a $1,000 life insurance policy so as to exclude Bert.

■ There is no direct evidence of undue influence in this case. There seems to be some claim that the evidence of the tenant Osler is direct evidence of undue influence exercised over Mrs. Armstrong by Milton, but, as we read that testimony, the most that Osler testified was that Mrs. Armstrong took Milton's side in the arguments with Bert, and apparently believed Milton's version of the trouble between himself and Bert, but on direct examination this witness testified: "I can't say that Milton or Maude said much against Bert in my presence." It seems clear to us that this testimony is not direct testimony of undue influence. As we read this record, it is only from circumstances shown in the evidence that undue influence might be inferred. It is necessary,

therefore, to refer to the circumstances which it is claimed are sufficient to establish that the mother in making this will was unduly influenced by Milton. In this connection it should be kept in mind that "the theory that underlies the doctrine of undue influence is that the testator is induced by various means, to execute an instrument which, although his, in outward form, is in reality not his will, but the will of another person which is substituted for that of the testator." Page on Wills (2d Ed.) § 188.

Clearly, evidence which merely shows that a party benefited by a will had the motive and opportunity to assert such influence is not sufficient to invalidate the will where this is no evidence that he did assert such influence. Ekern v. Erickson, 37 S. D. 300, 157 N. W. 1062, 1066; Gillette v. McLaughlin, 44 S. D. 499, 184 N. W. 277; Swanson v. Swanson, 54 S. D. 42, 222 N. W. 491; Peterson v. Imbsen, 46 S. D. 540, 194 N. W. 842.

It is contended that the fact that Mrs. Armstrong had, prior to the making of this will, expressed the thought that Bert should share in her property the same as the other children, is a circumstance showing that the will was executed under undue influence. We cannot agree with this contention. As stated in the case of Ekern v. Erickson, supra: "Such evidence, though not competent to prove acts of undue influence, was competent and relevant, in connection with other evidence, as tending to show susceptibility to undue influence." The same rule was again announced in Johnson v. Shaver, 41 S. D. 585, 172 N. W. 676, 678, wherein the Ekern v. Erickson Case was relied upon. Under this rule, while the evidence is competent to show susceptibility to undue influence, it has no probative value in showing the fact of undue influence. Unless there is evidence that undue influence was in fact exerted, the evidence of the statement of testatrix expressing a testamentary purpose to include Bert is without any probative value whatsoever.

In the Johnson v. Shaver Case there is the statement that "The keeping of the existence of a will secret from those who have an equal right to know of its existence is a badge of undue influence." Respondent relies upon this statement of the law. One early Wisconsin case is cited in support of this statement (Watkins v. Brant, 46 Wis. 419, I N. W. 82, 86). This Wisconsin case

involved a deed to land, title to which was in the name of the wife but upon which the husband had placed valuable improvements, and which deed was executed by the wife without the knowledge of the husband. In that case the court said: "When husband and wife are living together in accord, it is an essentially vicious thing, in any ordinary circumstances, to negotiate with the wife for her separate estate, her children's prospective inheritance, upon condition of concealment from her husband." In Page on Wills (2d Ed.) § 769, the South Dakota case and the Wisconsin case therein cited are the only cases set out in support of a similar statement found in that text. It might be that the keeping of the will a secret under certain circumstances is a badge of undue influence, but under the circumstances prevailing in this case we cannot hold that the failure of the mother to disclose to Bert the fact that she made a will or the failure of Milton to make this disclosure is any evidence of undue influence. Under the conditions existing between Bert and his mother, and Bert and Milton, it would seem only natural that Milton or his mother would not disclose to Bert the fact that a will had been made. Certainly, it would seem that Bert who quarreled with his mother, who in these quarrels became angry "the same as she did," and who did not go to see his invalid mother for long periods of time, did not have an equal right with Milton or Maude to know of the will being made. We conclude, therefore, that the fact that Bert was not advised of this will being made is not a circumstance under the facts here presented which has any probative value upon the question of undue influence.

"The burden is upon the contestant to establish undue influence. Ekern v. Erickson, supra. To sustain such burden, however, it is only necessary that there be a preponderance of the evidence showing undue influence. Schouler on Wills, § 242; Alexander on Wills, § 931. But, as above noted, where the will contains unjust or unnatural provisions, it demands close judicial scrutiny; the onus devolves upon the proponent to prove a reasonable explanation of the unnatural character of the will; there must be fair proof that the testator had mental capacity to comprehend its import; and the court must, from all the evidence, be led to believe that undue influence did not produce the unjust or unnatural disposition." Johnson v. Shaver, supra.

■ Accepting this statement as an exact statement of the law upon the subject, we are of the opinion that the proponent of this will has proven "a reasonable explanation of the unnatural character of the will." It not only appears that Bert and his mother quarreled, but it further appears that for years Milton had given freely of his time and effort in caring for his mother. It was Milton who ministered to the needs and wants of the mother during the many years that she was physically incapacitated. Without detailing the many services performed by Milton for his invalid mother, it is sufficient to say that they were many. In our opinion, even if Bert and his mother had not quarreled and had not become estranged, these services performed by Milton for the mother would themselves be sufficient to explain why the mother had preferred Milton over her other children by the terms of this will.

■ It is true that the testimony of Milton on cross-examination was evasive and in some instances unbelievable, but in the absence of testimony showing that he had influenced his mother in making this will, we fail to see that this fact is material. While the evidence discloses that Milton played some part in the preliminaries leading up to the drawing of this will, nevertheless, he did voluntarily absent himself from the room where and while the will was being drawn. He might have been in a position to hear what was said, but he did not in any way actively participate in any of the proceedings at the time the will was executed. There is not a thing in this record to show that Milton did anything whatever to direct or solicit any preference to himself under this will or ever suggested that the testator make this will. We are of the opinion that the contestant failed to establish by a preponderance of the evidence the fact of undue influence. It appears to us that under the facts and circumstances here disclosed, if it can be said that there was an unnatural disposition of Mrs. Armstrong's property under the terms of this will, that the unnatural disposition has been fully and fairly accounted for.

The judgment and order appealed from must be reversed.

ROBERTS, WARREN, and SMITH, JJ., concur.

POLLEY, J., dissents.

POLLEY, J., (dissenting). I am not able to agree with the

majority of the court and express some of my views of the case as follows:

At, and for several years prior to, the execution of the will, the decedent and Milton and Maude lived together as a family in the same house. The decedent was seriously afflicted with diabetes and neuritis and had not been able to walk for the past seven or eight years. She spent her time in a wheel chair and her wants were attended to by Milton, though assisted to some extent by Maude. The will was drawn by Mr. Trygstad, though the evidence does not show when or where it was drawn, nor at whose direction. The will was signed by a Mr. Gullick and Dr. Grove, who signed as subscribing witnesses. While the will was being signed Milton was in an adjoining room where he could hear and see what was said and done by his mother and the others in the room with her, but he does not appear to have taken any part in what was being done at that time, and testified that he did not know the nature of the business that was being transacted. This statement was palpably false, and on cross-examination he admitted that it was false. Maude was not in the house at that time.

The trial court prepared and filed a memorandum opinion setting out many of the salient facts in the case which opinion, in part, reads as follows:

"It is well to consider the facts surrounding the execution of said will by the deceased. At the time Josephine Armstrong executed the will the evidence clearly shows that she was a lady about eighty years of age, that she had been almost an invalid for nearly fifteen years and for several years had been in a wheel chair. She had been suffering for several years from diabetes and was in a weakened condition at the time of the signing of the will and at that time was living in a home with Milton her son and Maude her daughter. The evidence also discloses that there had been trouble between Milton and his brother Charles Herbert for several years over property relations. Such trouble proceeded to such an extent that a suit was pending between them in the Court at that time. Milton was an unmarried man, living at home and looking after his mother's property and he and his sister attended to her physical needs and care. The brother Charles Herbert, the plaintiff herein, by reason of the disagreement between himself and his

brother did not go to his mother's home or at least had not been there for a long time prior to the execution of the will. But it appears from the evidence that there was no illwill on the part of the mother towards her son Charles, but that by reason of the son Milton living with her she listened to his side of the trouble between himself and his brother and at times appeared to feel that Charles was in the wrong in the matter.

"The witness C. R. Osler, tenant on a farm belonging to deceased, testified that he was at the home of Josephine Armstrong in September, 1930, and talked with her concerning her son's troubles between themselves and his testimony is as follows:

" 'She said she couldn't see why this trouble should come as she thought just as much of Bert as she did of the others and Bert would get his share just as much as the others.'

"On the day of the execution of the will Mr. Trygstad, attorney for the defendants, came to the Armstrong home prepared to draw the will and the evidence discloses that Milton called the witness to come to the Armstrong home to witness the execution of the will and he was the only member of the family (except the mother) present at the time such will was executed and during the time it was being executed he sat in another room from the one occupied by his mother and Mr. Trygstad and the witness but only a few feet away and there was a double door opening from the room in which he was into the room in which his mother and the others were and that he heard and knew what was going on.

"Both witnesses testified that Mrs. Armstrong was very weak and Dr. Grove testified that she said at the time she signed the will: 'Oh, Doctor, this is the hardest thing I ever did in my life' then added 'I am making my will.' The witness, Dr. Grove, was then asked the following question: 'State whether she appeared to be in mental distress?' and he answered 'She cried at that moment when she said it.' "

"The evidence further discloses that the mother had made an earlier will in which all of the children were named as beneficiaries but that such will has been destroyed and all of the children knew about it but that when this will was made the Plaintiff Charles Herbert Armstrong knew nothing of it until after his mother's death and that he was living in the town of Arlington, S. D.,

where his mother lived and only four or five blocks away from her home. That Josephine Armstrong died on or about March 8th, 1932, and some 16 months or thereabout after the execution of the will.

"That by reason of the desire of both plaintiff and defendants to have said case tried upon the transcript of evidence this Court did not have the benefit of having the witnesses appear in person and testify before him. However, it is quite apparent that the testimony of Milton E. Armstrong was biased and evasive; especially as to his connection with the will having been executed by his mother. It appears that Milton and Charles had a great deal of trouble over their property relations for several years prior to their mother's death and no doubt they were both to blame for this trouble, but it does appear that Milton took advantage of his mother's weakened condition and tried to prejudice her and get her to become biased in his favor as against Charles. Notwithstanding such actions on the part of Milton it appears that the mother had a mother's love for all of her children and would not have disinherited Charles had it not been for the undue influence practiced upon her by Milton. She at the time of the execution of said will and for some years prior being practically an invalid and being affected with a disease the tendency of which is to weaken the mental faculties of the person affected. It seems to me quite clear that the purported last will and testament of Josephine Armstrong, deceased, which appears to have been executed on November 3rd, 1930, was executed by her under undue influence on the part of Milton E. Armstrong and that the sister in some measure aided her brother Milton in influencing the mother to execute the will disinheriting their brother Charles.

"The Court therefore holds that the said will, by reason of the undue influence practiced on the said Josephine Armstrong, deceased, was not her voluntary act and deed and therefore is void and should not be permitted or allowed to be probated as and for her last will and testament. The court upholds and sustains the lower court's decision."

There is no doubt that Mrs. Armstrong told the subscribing witnesses that the document in question was her last will and testament, and that she asked them to sign it as witnesses, but it

fairly appears from the evidence that she did not know all that was in the will when she signed it.

Milton engaged Mr. Trygstad to draw the will and gave the directions for the disposition of the property. It is very clear from the evidence that Mrs. Armstrong never read the will herself, and it is also clear from the evidence that the entire will was never read in her presence. Upon this subject, Mr. Gullick, one of the subscribing witnesses, testified: "As far as I know, this instrument had been prepared before I came there. There was no talk whatever while I was here concerning the contents of this Exhibit 1. It was read aloud in my presence. I think Mr. Trygstad read it as I remember it—Well, I think there was something said about the contents—don't know who read the contents. It wasn't read in its entirety. This is the side that I saw—I remember seeing some handwriting there." Dr. E. H. Grove, the other witness to the signing of the will, testified: "Bert Armstrong was not present when the will was executed but I saw Milton there when I went into the room. I am not positive about Maude. The three of them were living together in the home. Nothing was said on that occasion in my hearing about calling Bert in at the time the will was executed. Bert lived a couple or maybe three blocks away. So far as I know no effort was made to have him present. I was not apprised of the condition of the will at the time I signed as a witness. It was not read in my presence. * * * The will had been written up before I was called as a witness. I was called by telephone by Milton. He did not tell me what for. I did not know what it was for until I arrived there. * * * I was there first before Mr. Trygstad or Mr. Gullick arrived. After I arrived Mr. Gullick and Mr. Trygstad came. Milton was already there. He did not explain why he had called me. Mrs. Armstrong was the one that spoke to me and made a little explanation. Mr. Trygstad asked if she wanted Mr. Gullick and I to sign as witnesses and she responded in the affirmative. I do not know whether she had read the will before that time. What she said with reference to it being her will was the words I gave before that."

Indulging the presumption that the decedent knew the contents of the will when she declared that it was her will, such pre-

sumption was overcome by the affirmative evidence of one of the subscribing witnesses that Mrs. Armstrong did not read the will and that it was not read in its entirety to her. She did not know the contents of the will when she signed it, and it is not entitled to probate.

Some time after the will in question in this proceeding had been executed Herbert asked his mother if she had made out a second will and she said, "No," that she had not.

I am fully satisfied after a careful study of the testimony of all the witnesses who testified at the trial of the case that the facts set out in the memorandum opinion of the circuit court are fully supported by the evidence and that the said decedent was induced to make the said will by the fraudulent misrepresentations and undue influence practiced upon her by the said Milton Armstrong, and that because of said fraudulent and undue influence the said will was not her voluntary act, and therefore a retrial should be had; and when the case is tried it should be tried on the testimony of the witnesses and not upon a transcript of testimony taken at a former trial.