## IN RE ESTATE OF SHABLEY

(189 N.W.2d 460)

(File No. 10795. Opinion filed September 7, 1971)

Rehearing denied October 19, 1971

**Anderson & Hutchinson,** Huron, for appellant.

**Willy, Pruitt & Matthews,** Sioux Falls, **Roland Cutler,** Wessington Springs, for respondent.

WINANS, Judge (on reassignment).

This is a will contest involving the will of Frank Shabley, a single man, who died on or about the 7th day of February, 1968, at the age of 90 years. He left an estate consisting principally of one quarter section of real estate located in Jerauld County, South Dakota. On February 15, 1968, Mrs. Genevieve Wahl, who along with her husband operated the Pheasant Hotel in Wessington Springs, South Dakota, petitioned the County Court of Jerauld County for probate of this last will and testament of said deceased, which is dated April 24, 1967, and that Letters Testamentary issue to her as the named executrix in said will. L. H. Rhodes, respondent herein, a nephew of the deceased, appeared in opposition and contested this will on the grounds of lack of testamentary capacity of the decedent and undue influence on the part of the sole beneficiary, Genevieve Wahl.

The decedent, on February 13, 1960, made a will in which he left his entire estate to a sister, three nieces and six nephews in equal shares. This will named the nephew, L. H. Rhodes, as executor and he also petitioned the County Court of Jerauld County for probate of this will which was contested by Genevieve Wahl on the grounds of undue influence, and that it had been revoked by the will of April 24, 1967. By stipulation the trial of such contested wills was consolidated. The County Court of Jerauld County upheld the will of April 24, 1967, which by its terms revoked all previous wills. From the county court decision Mr. Rhodes appealed to the circuit court on issues of both fact and law and again upon stipulation of counsel both matters were tried together to the court de novo in Wessington Springs on July 17, 1969. Also, by stipulation, the testimony taken in county court was admitted in circuit court and was supplemented by two depositions and oral testimony from a number of additional witnesses. The circuit court entered findings of fact and conclusions of law holding that the testator had testamentary capacity on April 24, 1967, but reversed the

county court on the question of undue influence and revoked and invalidated the will of April 24, 1967. From the judgment of the court denying probate Mrs. Wahl appeals to this court. There is no appeal from the finding that testator had testamentary capacity and this is, therefore, not an issue here. This court in the recent case of In re Estate of Hobelsberger, 1970, 85 S.D. 282, 181 N.W.2d 455, which was a will contest, stated:

> "It was for the trial judge to select from the conflicting evidence that which he would believe. He, not this court, is the trier of the facts. * * * On review the successful party is entitled to the benefit of his version of the evidence, and of all favorable inferences fairly deducible therefrom. In re Blake's Estate, supra.

> In this jurisdiction appellate review of findings of fact is now governed by SDCL 15-6-52(a). That section provides in part that:

> 'Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses.'

> This quoted terminology came into our law as a part of Rule 52(a) of our 1966 Rules of Civil Procedure, which took it from Federal Rule 52(a). In adopting this portion of the Federal Rule it is presumed that we adopted it with the meaning previously given it by the United States Supreme Court. Melby v. Anderson, 64 S.D. 249, 266 N.W. 135. This was the view of the State Bar Committee which proposed these rules for adoption. See the paperback pamphlet of the rules printed and distributed by the West Publishing Company—Introduction, p. IV.

> The United States Supreme Court in construing that language in United States v. United States Gypsum Co., 333 U.S. 364, 68 S.Ct. 525, 92 L.Ed 746, and rehearing denied 333 U.S. 869, 68 S.Ct. 788, 92 L.Ed. 1147, said:

'A finding is "clearly erroneous" when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'

See Barron & Holtzoff (Wright) Federal Practice and Procedure—Rules Edition, § 1133."

The right to make a will and dispose of one's property is clearly a very important right, as expressed by this court in the following language in the case of In Re Rowland's Estate, 1945, 70 S.D. 419, 18 N.W.2d 290:

"An important right given by statute to every person of full age and of sound mind is the right to dispose of his property by will, within the limits fixed by statute, as he chooses. Johnson v. Shaver, 41 S.D. 585, 172 N.W. 676. This right, of course, must be exercised when the testatrix has testamentary capacity and is not subject to undue influence. Mere general influence, however strong or controlling, not brought to bear on the testamentary act, is not sufficient. In re Schaefer's Will, 207 Wis. 404, 241 N.W. 382; Mackall v. Mackall, 135 U.S. 167, 10 S.Ct. 705, 34 L.Ed. 84. Proof of mere opportunity to influence the mind of the testatrix, even though coupled with an interest or with a motive, is not sufficient. Gillette v. McLaughlin, 44 S.D. 499, 184 N.W. 277; Vassilos v. Arnold, 47 S.D. 147, 196 N.W. 545; Peterson v. Imbsen, 46 S.D. 540, 194 N.W. 842; In re Swanson's Estate, 54 S.D. 42, 222 N.W. 491; Tobin v. Nordness, 47 S.D. 255, 197 N.W. 783. Influence, to be undue, within the meaning of the law, must be of such a character as to destroy the free agency of the testatrix and substitute the will of another person for her own. In re Armstrong's Estate, 65 S.D. 233, 272 N.W. 799."

■ The burden of proving undue influence is on the contestant. In re Metz' Estate, 78 S.D. 212, 100 N.W.2d 393, we held:

"The burden was on contestant to establish the undue influence of Herman Imel by a preponderance of the evidence. Ekern v. Erickson, 37 S.D. 300, 157 N.W. 1062. This burden was fulfilled to the satisfaction of the trial court. Therefore its finding of undue influence will not be disturbed unless it appears from the record there is a clear preponderance of the evidence against it. In re Peterson's Estate, 77 S.D. 525, 94 N.W. 2d 661."

In this will contest the contestant, L. H. Rhodes, accomplished this burden to the satisfaction of the judge of the circuit court on appeal from the district county court.

Appellant recognizes the rule of review which we have set forth, but urges that in this case the trial court's findings are not presumptively correct and asks the court to review the evidence as though presented in the first instance, citing State Automobile Casualty Underwriters v. Ruotsalainen, 1965, 81 S.D. 472, 136 N.W.2d 884. Appellant's position on this is stated in the following language:

"We are not unmindful of the well-established appellate rule that where the question presented by an appeal is the sufficiency of the evidence to support the trial court's findings, that such findings will not be disturbed unless they are contrary to the clear preponderance of the evidence. This rule has its basis and reason in the proposition that since the trial court heard and observed the witnesses and had opportunity to judge first-hand their credibility, it might better evaluate the weight to be given the testimony. However, we urge that on this appeal, the scope of appellate power is not so limited by this general rule, since, as a matter of fact, the trial court did not hear and see the majority of the witnesses and that for the most part the trial was had upon the cold record, consisting of depositions and the transcript of testimony taken upon trial before the County Court."

In our review of the transcripts on the appeal it appears the parties stipulated in the trial de novo before the circuit court that the testimony taken on the trial before the district county court and reduced to writing by the reporter in the form of a transcript "shall be taken and considered by this Court at this hearing with the same force and effect as if those witnesses would testify in open court on the witness stand." In addition to such stipulation the circuit court did hear the oral testimony of seven witnesses which included the testimony of appellant herself and the testimony of the wife of the respondent. The additional evidence before the circuit court by oral testimony of witnesses, to some extent, concerned the physical and mental weaknesses of the testator. In Johnson v. Shaver, infra, we held that evidence of physical and mental weakness is always material upon the question of undue influence. Apparently it is thought to bear on the testator's susceptibility to such influence. The transcript of the oral testimony in circuit court consists of 92 pages, and the only depositions submitted to the circuit court are those of two doctors who testified to the decedent's mental capacity and it is noted that decedent's testamentary capacity is not an issue on this appeal. We think this clearly distinguishes this case from State Automobile Casualty Underwriter's, supra, because in the latter case all of the testimony supporting the court's findings was taken by deposition except for one witness. We conclude that under the circumstances of this will contest we must review the evidence under the rule announced in Estate of Hobelsberger, supra. This becomes important because in our opinion the circuit court might on the evidence have arrived at a contrary conclusion on both the question of mental competency and on the question of undue influence. As to the latter question it is noted that the county district court did make a contrary judgment.

In Johnson v. Shaver, 1919, 41 S.D. 585, 172 N.W. 676, this court said:

"One who is mentally incompetent to do a certain act cannot, as to such act, be the subject of coercion. But it is often a close question whether the invalidity

of a particular will should be placed upon mental incapacity or upon undue influence. Certain it is that while mere physical weakness is not necessarily evidence of undue influence * * * evidence of physical and mental weakness is always material upon the question of undue influence * * *:

'Undue influence is associated with testamentary capacity, since the amount of influence necessary to affect the testator varies according to the strength of his mind.' "

In re Metz' Estate, supra, holds:

"Obviously, an aged and infirm person with impaired mental faculties would be more susceptible to influence than a mentally alert younger person in good health."

Undue influence is defined and the necessary elements of proof thereof are set out in the case of In re Metz' Estate, supra, as follows:

"Its essential elements are (1) a person susceptible to such influence, (2) opportunity to exert such influence and effect the wrongful purpose, (3) a disposition to do so for an improper purpose, and (4) a result clearly showing the effect of such influence. In re Rowland's Estate, 70 S.D. 419, 18 N.W.2d 290."

The trial court made findings: That at the date of the execution of the will on April 24, 1967, the decedent suffered mental and physical infirmities; that a confidential relationship existed between decedent and proponent and that proponent actively participated in the preparation and execution of such will and that after its execution proponent showed an equally active concern that it not be revoked or contested with the aid of an incompetency adjudication. In addition the trial court made the following findings:

"(1) That on April 24, 1967, FRANK SHABLEY was a person susceptible to undue influence;

(2) That an opportunity existed for the said GENEVIEVE WAHL to exert undue influence;

(3) That the said GENEVIEVE WAHL showed a disposition to exert undue influence;

(4) The result of the Will clearly shows the effect of such influence."

■ The issue before us is whether such findings are "clearly erroneous" as we have hereinbefore defined such term and we reach the conclusion that they are not.

The decedent lived on his farm in Jerauld County until January 1960, being at that time 82 years of age, when he was admitted to the hospital in Wessington Springs where he remained until February 13, 1960, to be discharged to custodial care. His mental and physical condition at the time was such that he was unable to care for himself and from the hospital he went to Storla, S. D., where he remained for nearly three years.

In December 1962 the decedent moved to the Pheasant Hotel operated by proponent and her husband and remained there until approximately May 1963, then back to live on his farm for a time. He again lived at the hotel with the Wahls from January 1, 1964 and most of 1965, going to the hospital from there and after being in the hospital for a time he went to Weskota Manor, a nursing home in Wessington Springs, returning to the hotel to live early in 1966. In August of 1966 he returned to Weskota Manor, staying until April 10, 1967 when he returned again to the hotel. He was admitted to the hospital in Huron, South Dakota, in January of 1968 where he died the following February. Decedent lived for an accumlated period of approximately four years at the Pheasant Hotel where he was cared for by the Wahls. He relied on them to care for him and discussed his business affairs with Mrs. Wahl and rented his farm to her son. Proponent paid decedent's bills and made his bank deposits. She was kind to the decedent and his relationship with her and her husband was friendly and cordial.

On April 19, 1967 testator was adjudged incompetent by the County Court of Jerauld County and the National Bank of South Dakota was appointed guardian of his estate. These

proceedings of incompetency were had without notice to or the presence of the decedent. The bank thereafter qualified and letters were issued on April 25, 1967.

Doctor T. B. McManus, M.D., now practicing in Sioux Falls, South Dakota as a board qualified psychiatrist, testified that he was in the general practice of medicine in Wessington Springs from 1952 to July 1, 1966, and that Frank Shabley had been his patient on many occasions between January 21, 1955 and July 1, 1966, and that during this period of time decedent's physical and mental condition deteriorated with advancing age and in his opinion the patient by 1965 was not fully competent mentally because of senility, and this condition was permanent.

The decedent was clearly a person susceptible to undue influence and the evidence shows that a confidential relationship existed between him and proponent to the extent that proponent was in a position of dominance and that they were not on an equal footing.

"Such relationship exists whenever trust and confidence is reposed by the testator in the integrity and fidelity of another." In re Hobelsberger, supra.

In Re Rowland's Estate, 1945, 70 S.D. 419, 18 N.W.2d 290, the court held:

"(11) The mere existence of a confidential relation between a testatrix and a beneficiary under her will such as an attorney and client, physician and patient and clergyman and parishioner does not require a finding of undue influence and does not raise a presumption of undue influence nor cast the burden upon the beneficiary of disproving same. 66 A.L.R. 228. However, the existence of such a relationship may demand close judicial scrutiny. In re Daly's Estate, 59 S.D. 403, 240 N.W. 342. It is the rule in many jurisdictions that when in addition to the confidential relation there exists suspicious circumstances such as the fact that the beneficiary took part in the preparation or procuring of the will,

undue influence is presumed and by such proof contestant makes out a prima facie case. 68 C.J., Wills, § 451; Page on Wills, § 818 et seq."

The evidence shows that in August of 1966 Mrs. Wahl, proponent of the will in question, called Mr. Roland Cutler, an attorney in Wessington Springs, and asked him to come to the hotel. Mr. Cutler testified that Mrs. Wahl told him that Mr. Shabley wanted to give her $1,000 and Mr. Cutler advised Mrs. Wahl that it would be necessary for him to visit with Mr. Shabley alone and after visiting with him he refused to draft his will. He further testified as follows:

"Well, I asked him if he wanted to change his will, Mrs. Wahl had told me that he said he wanted to give her a thousand dollars, and I asked him if that was so and he just sat there with his head kind of hanging down. He wouldn't say anything one way or another, and I tried to get him to express what he wanted to do, and he acted as if he just didn't know what he wanted to do. I determined from that that he didn't want to change his will, or he didn't know what he wanted to do."

Mr. Cutler is the attorney who drafted the prior will which left the property to the relatives of Mr. Shabley.

On April 24, 1967, proponent made arrangements with Margaret Herdman, a close friend to accompany her, her husband and Mr. Shabley on a trip to Huron as they would need a witness to a will that decedent was going to make, which Mrs. Herdman did. Decedent was taken to Huron where a lawyer was chosen at random that knew none of these people and in the presence of Mr. & Mrs. Wahl and Mrs. Herdman and decedent the matter of drafting a new will was discussed with the lawyer. Mrs. Wahl was present throughout the entire conference and the signing and witnessing of the will that left her as the sole beneficiary and which revoked all previous wills and there is evidence that either Mrs. Wahl or her husband paid the attorney's fee for his services and there is no evidence that Mr. Shabley consulted privately with the attorney. There is further evidence

that Mrs. Wahl notified the contestant, nephew of Mr. Shabley, that he could not come to the hotel to visit with him, but the evidence also shows that the nephew did speak with him when Mr. Shabley was on the porch of the hotel. The record does not reveal that Genevieve Wahl ever informed Mr. Rhodes or any other relative of Mr. Shabley of the April 24, 1967 will. In Johnson v. Shaver, supra, this court said:

> "The keeping of the existence of a will secret from those who have an equal right to know of its existence is a badge of undue influence."

A further resume of the evidence would serve little purpose. There was additional evidence on both sides and it was the trial court's province to sift the same and draw his own conclusion, which he has done, and we are of the opinion that there is evidence to support it and on the entire evidence we are not left with the definite and firm conviction that a mistake has been committed. Consequently we affirm the judgment of the circuit court.

RENTTO, P. J., and HANSON, J., concur.

BIEGELMEIER, J., dissents.

WOLLMAN, J., concurs in dissent.

BIEGELMEIER, Judge (dissenting).

I believe the St. Auto Casualty Underwriters v. Ruotsalainen opinion, 1965, 81 S.D. 472, 136 N.W.2d 884, applies here for the reason the county court held Shabley (1) competent and (2) no undue influence. On appeal the circuit court tried the issues on the transcript of evidence received in the county court plus depositions of two doctors and other witnesses. **All** of this evidence was directed only to competency—**none** of it to undue influence.

The circuit court also held Shabley competent however, and as the opinion states, his "testamentary capacity is not in issue". Only the undue influence issue is involved, and on that the circuit court had, as we here have, the transcript of county court evidence. So in our review here

> "there is no presumption in favor of the trial (circuit) court's determinations. (and) Accordingly, it is our duty to review the evidence and determine the issues involved as though presented here in the first instance." St. Auto Casualty Underwriters v. Ruotsalainen, 81 S.D. 472, 136 N.W.2d 884.

On this issue the "facts" are not much in dispute by any of the witnesses—the evidence is analyzed in the thorough 15-page opinion by the county judge. It was on this testimony, where the witnesses appeared before him, that the county judge held no undue influence was shown, and on the transcript of this evidence the circuit judge held the opposite. Under that situation we should give greater weight to the county judge's findings than those of the circuit judge even if we did not have the Ruotsalainen rule to follow.

As to the evidence, it was general in effect. I do not review it here in detail. With respect to the In re Daly's Estate, 59 S.D. 403, 240 N.W. 342; In Re Metz' Estate, 78 S.D. 212, 100 N.W.2d 393; and In Re Blake's Estate, 81 S.D. 391, 136 N.W.2d 242 opinions, I cannot conclude there was any confidential relationship with Wahls here—if anything, Rhodes was in such status until sometime in early 1967.

In Metz where the court held a confidential relationship existed, Imel the beneficiary had a power of attorney from the deceased (this agency is a **trust** relation) and used it to withdraw several thousand dollars from the Metz bank account, sell his property, etc. Metz was bedridden or in a wheelchair, totally dependent on Imel who also alleged in a petition to be appointed guardian of Metz that he was "childish". In Re Daly's Estate, supra, the New Jersey lawyer drew a will which left practically all Mrs. Daly's property to him in trust for his own son, referring therein to the lawyer as a cousin, which he was not.

The 1965 In Re Blake's Estate, 81 S.D. 391, 136 N.W.2d 242, opinion states:

> "Influence to be undue must be such as to destroy the free agency of the testator and substitute the

will of the person exercising it for that of the testator."

Shabley was not of that type. Even some of Rhodes' witnesses admitted he was "stubborn" and "had a mind of his own". This evidence is without dispute. These same witnesses also testified he knew he had relatives and a farm, and was understandably attached to it. He appeared without counsel at a hearing on the guardian bank's petition to sell it in probate court and fought for it, as he objected "Very strenuously" to having it sold. He battled the guardian bank, its attorney and a county judge who now testifies he was then incompetent—and prevented the sale of the land. This was in December 1967, eight months after the challenged April 1967 will was executed.

In Re Blake's Estate, supra, declares "The burden is on the contestant to establish undue influence" and, there as here,

> "The testator had no near relatives and there was no unnatural disposition of his estate. Nieces and nephews (who were contestants) are collateral heirs and because of such relationship alone are not the natural objects of a testator's bounty."

Further, in Blake the court then said:

> "The evidence on the degree of affection or animosity between the decedent and Arthur Blake (contestant) and between him and Mrs. Dotson (no blood relation who got 35%) was in dispute * * * the more persuasive seems to be on the side of a definite ill feeling between the testator and Arthur (contestant)."

Here the ill will of testator toward contestant Rhodes prior to April 1967 is undisputed. Rhodes himself testified:

> "Q. Who was it that instituted this guardianship proceeding (April 19, 1967)?

> "A. (Mr. Rhodes) * * * when they asked me I said someone must look after his finances and I

couldn't because **he is mad at me.**" (Emphasis supplied. Rhodes did, however, sign the petition to appoint a guardian).

Conversely, a Rhodes' witness, Gladys Ferren, testified Mrs. Wahl gave Shabley "Good care" and he "liked her".

After my review of the record I conclude contestant Rhodes did not sustain the "burden * * * on the contestant to establish undue influence", Blake's Estate, supra. It seems only natural that Shabley would want his property to go to a person who gave him good care and whom he liked rather than to Rhodes, in whose own words, "he was mad at" and other nephews and nieces (and now some grandnephews and grandnieces unknown to him). Rhodes was careful enough in the Rhodes' dictated and prepared will to give himself and each of his children a 1/10 interest in that will, the same 1/10 it gave Shabley's own sister in Washington and other nephews and nieces and not the sister's share she was entitled to under the laws of succession. Therefore, no weight can be given to this small share to the sister. Rather it shows an unnatural bias against her in favor of the Rhodes clan. The county court, which here was the real trial forum, was correct in admitting the 1967 will to probate.

It is unfortunate the litigants here have had two trial courts determine the facts and their rights and reach differing results. This was occasioned by the law then effective, SDCL 30-35-1, which allowed appeals from the district county court to the circuit court, with trial de novo therein. SDCL 30-35-19. The legislature may have recognized this problem as SDCL 30-35-1 was changed by Ch. 151, § 5, S.L.1971, to allow appeals in these proceedings direct to the Supreme Court.

WOLLMAN, J., concurs in this dissent.