271 N.W.2d 52 (1978)
In the Matter of the ESTATE of Eugene J. PODGURSKY, Deceased.
UNITED STATES of America, Contestant and Appellant,
v.
Glendon SORENSON and Gertrude Sorenson, Proponents and Respondents.
No. 12183.
Supreme Court of South Dakota.
Argued February 15, 1978.
Decided October 26, 1978.
*53 Jeffrey L. Viken, Asst. U. S. Atty., Sioux Falls, for contestant and appellant; David V. Vrooman, U. S. Atty., Sioux Falls, on brief.
Terrence R. Quinn and Thomas E. Carr of Stephens, Quinn, Carr & Tschetter, Belle Fourche, for proponents and respondents.
BIEGELMEIER, Retired Justice.[*]
On March 10, 1976, proponents filed a petition for the probate of the Last Will and Testament of Eugene J. Podgursky, deceased. To that petition the United States of America, hereafter sometimes referred to as contestant, filed a "Complaint Contesting Will," alleging the deceased died on January 9, 1976, in the Veterans' Administration Hospital, Ft. Meade, South Dakota, and at the time of his death was unmarried and without heirs; that his estate consisted of funds derived from benefits payable under the laws administered by the Veterans' Administration of the United States and that under 38 U.S.C.A. § 3202(e)[1] and SDCL 30-6-14, it was interested in said will and such estate.
Contestant further alleged that on the date of the will, and for a long time prior thereto, Podgursky was "incompetent to make a last will and testament because of unsoundness of mind and insanity." In addition to and in alternative to that claim, Contestant alleged the "will was not his free and voluntary act but was the product of duress and undue influence against the decedent" without naming Sorensons as the persons who had engaged in the duress or undue influence. The trial court entered findings of fact, conclusions of law and a judgment upholding the will and admitting it to probate. Contestant's appeal asserts the two grounds set out in its complaint, i. e., Podgursky's incompetence and undue influence.
Podgursky was born August 12, 1903, discharged from the U. S. Army on April 15, 1943, admitted to the Veterans' Administration Hospital at Ft. Custer, Michigan, in October, 1944, and transferred to the Veterans' Hospital, Ft. Meade, South Dakota, on June 15, 1960. The evidence showed that when veterans had improved enough while in the hospital so that they were receiving only custodial care they would be placed in foster homes. Under that plan, about one hundred veterans reached that status and were placed to live in private homes. Podgursky, who had earlier been living in another home, was placed in the Sorenson home in 1967. It was while he was living there that the will involved in this controversy was executed on March 8, 1974. A condensed statement of the evidence will indicate the questions involved in the appeal.
For the proponents, James Hood, a practicing attorney of Spearfish, South Dakota, testified he first met Podgursky when the latter came to his office with the Sorensons and another veteran in February, 1974, pursuant to an appointment; that he talked to Podgursky alone in his private office, and that he asked him his name and gathered from him that he wanted a will. Hood asked him if he had any relatives; Podgursky said he had only distant cousins in Russia, but he never heard from them, they never wrote him and he did not know their names or who they were. Hood asked Podgursky to whom he wanted to leave his property and he indicated the Sorensons, with whom he had been living. Podgursky indicated that he never had been married, had no children or other close friends so he wanted the property, whatever he had, to go to the Sorensons, who had been good to him. Asked about his property, he said he owned no real estate, only personal property.[2] After this conference, which lasted *54 about half an hour, an arrangement was made for another meeting for the execution of the will, which was to be prepared in the meantime. The date was fixed later by phone as March 8th, at which time Mrs. Sorenson drove Podgursky to Hood's office. Hood testified that it was his practice to present clients with a copy of the will and give them an opportunity to read it, a practice that he followed in the instant case. After Podgursky had looked at the will, Hood read it to him in full and asked him if he had any questions, to which Podgursky replied "no," and indicated that this is what he wanted and that he was ready to sign the will. Hood called in his secretary, and after Podgursky signed the will, Hood and his secretary signed it as witnesses. Hood had no interest in the will except his fee of $20 for preparing it; he knew Podgursky was a veteran and was under VA guardianship, as he was told to send his bill for his services to the guardian. The bill was sent to and paid to him by the guardian of Podgursky's estate, the American National Bank & Trust Company of Rapid City, the successor to which is named as executor of the will.
Crystal Marlyst, a secretary of the Hood law firm, testified regarding her conversations with Podgursky both times he was in the office; that at the second visit she read the will to him article by article explaining in simple terms what each one meant; that she thought he understood it; that she then took him into a private office, where Mr. Hood later called her in, again asked Podgursky if everything was satisfactory, to which the latter answered "yes"; that she believed Podgursky knew what he was doing, that he was making his last will and he understood it; that Mrs. Sorenson at all times remained in the reception room and did not say anything to Podgursky.
Contestant offered and the court admitted in evidence Podgursky's VA medical records. Dr. Herman, Chief of Psychiatry and Neurology at the Ft. Meade VA Hospital since 1959, was the first witness for contestant. He testified that he had read and reviewed these records in depth. The witness was asked the date and source of an entry prepared by another doctor in 1966 or 1967 covering 1,881 days Podgursky had been at Ft. Meade. It showed a principal diagnosis by that doctor of chronic schizophrenic reaction; attached to it was an addendum of July 18, 1967, showing the appointment of the bank as guardian. This record considered Podgursky "non employable and requiring constant supervision . . [and] incompetent for VA purposes." A continuing general objection to the medical records and the opinions Dr. Herman drew from them was overruled and the doctor testified that a schizophrenic reaction was a serious mental disease; a few people get well, but those chronic do not and for practical purposes it is not curable.[3] A 1965 entry stated: "This veteran . . . is manageable with the newer . . . drugs. For better management his placement in a foster home is desired." Dr. Herman testified: "This means he has improved, *55 he is not showing the signs of schizophrenia as bad as he once did." July and September 1975 records indicated Podgursky could not understand what P. Chemotherapy was, nor could VA personnel get him to make treadmill tests; the patient was not mentally able to handle his own affairs and was "well handled on Trilafon. . . and presents no problem from the point of view of his schizophrenia."
The evidence then returned to many entries with earlier dates and some without dates. The witness testified he thought the veteran was on Trilafon, a narrow tranquilizer, anti-psychotic medication, for many years including 1973, 1974, and 1975. Trilafon helps in suppressing the manifestations of paranoia but the witness did not see it as curing Podgursky's ailment.[4] The July 1975 medical record included a statement that is recurrent throughout that record and in the testimony of Dr. Herman that the veteran "is considered incompetent for VA purposes." The direct examination by contestant's counsel includes the following question and answer:
Q. I note in there that there is a reference to incompetent for VA purposes. When I use that term do you mean the same thing? In other words, when you say incompetent do you mean incompetent for VA purposes, or would you explain what you mean by incompetent.
A. Incompetent for VA purposes is part of the larger incompetence realm. We are administratively restricted from indicating anything except for VA purposes, which is related to their handling of such funds as they may be getting from the VA. Other issues of competence would have to be specified in order to come up. (Emphasis supplied.)
Finally, when asked whether based upon his training and experience and the VA medical records he was able to form an opinion concerning Podgursky's mental competence on March 8, 1974, Dr. Herman answered, "My opinion is he was incompetent for VA purposes throughout that time." Contestant's counsel then tried to get this witness's "interpretation of [Podgursky's] being incompetent distinguishing it from incompetent for VA purposes." Proponents' objection to the question led to this exchange between the trial court and the witness:
The Court: . . . you've testified twice . . . that he was incompetent for VA purposes, is that correct?
A. Yes, your Honor. . . . That. . . is the intent of our statements in our record. We do not go any further than to say that this man is incompetent for VA purposes.
On cross-examination Dr. Herman testified that he had never examined Podgursky, nor was there testimony by any doctor who had seen or examined him.
The testimony of contestant's other two witnesses, a VA social worker and a VA attorney, as well as proponents' two VA social workers will be adverted to later in the opinion.
We will first set out the guidelines that govern the execution of wills, their admission to probate and our review of the findings of fact, conclusions of law and judgments of trial courts. SDCL 29-2-3 provides that every person of eighteen years and of sound mind may execute a will for the purpose of disposing of his estate. The court has held consistently that for the purpose of making a will, one has a sound mind if able, without prompting, to comprehend the nature and extent of his property, the persons who are the natural objects of his bounty and the disposition that he desires to make of such property. In re Corson's Estate, 1912, 29 S.D. 14, 135 N.W. 666; Petterson v. Imbsen, 1923, 46 S.D. 540, 194 N.W. 842; In re Estate of Williams, 1974, 88 S.D. 55, 215 N.W.2d 489; Jones v. S. D. *56 Children's Home Soc., 1976, S.D., 238 N.W.2d 677. The burden rests upon the proponents of a will to establish the testamentary capacity of the testator at the time the will was executed. In re Estate of Melcher, 1975, S.D., 232 N.W.2d 442. The trial court found that proponents' evidence met that burden and those requirements and entered findings of fact to that effect. That is a duty and function of the trial court.
This court does not try such controversies de novo, as its scope of review is governed by SDCL 15-6-52(a)[5] and by the comment found in In re Estate of Hobelsberger, 1970, 85 S.D. 282, 181 N.W.2d 455. As was said in that opinion:
It was for the trial judge to select from the conflicting evidence that which he would believe. He, not this court is the trier of the facts. 85 S.D. at 288, 181 N.W.2d at 458.
That, in effect, was written in many of our prior decisions where it was variously stated that the function of this court is not to determine the weight of the testimony nor whether it, or a justice of this court, would have made the same or similar fact determination, but simply to ascertain whether or not there is evidence from which the trial court could properly draw its conclusions. Houck v. Hult, 1934, 63 S.D. 290, 258 N.W. 142; Rhode v. Farup, 1940, 67 S.D. 437, 293 N.W. 632; State Highway Commission v. Foye, 1973, 87 S.D. 206, 205 N.W.2d 100. Nor may we substitute our judgment for that of the trial judge. Brown v. Warner, 1961, 78 S.D. 647, 107 N.W.2d 1; Neb. Elec. Generation & Trans. Co-op. v. Walkling, 1976, S.D., 241 N.W.2d 150. It is also well settled that the credibility of witnesses and weight of evidence is for the trial court and that a reviewing court accepts that version of the evidence, including the inferences that can be fairly drawn therefrom, which is favorable to the trial court's determination. Nicolaus v. Deming, 1966, 81 S.D. 626, 139 N.W.2d 875; Schmidt v. Earl, 1968, 83 S.D. 245, 158 N.W.2d 184; Larson v. Syverson, 1969, 84 S.D. 31, 166 N.W.2d 424. The court has followed and applied these guidelines in will contest appeals, among them the Hobelsberger case and other recent opinions herein cited.
In Hobelsberger, supra, the testator was aged, infirm and had had a mild stroke while in the hospital, where the challenged will was executed. Several persons, including a nurse and neighbors, testified that testator was not able to recognize them, speak intelligently or understand them, and that he did not possess the mental capacity to make a will; the attesting witnesses and two other witnesses testified that testator was mentally competent. About a month after the will was executed testator was found to be suffering from a chronic brain syndrome"close to senility." In upholding the validity of the will this court, citing In re Blake's Estate, 1965, 81 S.D. 391, 136 N.W.2d 242, wrote: "On review the successful party is entitled to the benefit of his version of the evidence and of all favorable inferences fairly deducible therefrom." 85 S.D. at 288, 181 N.W.2d at 458.
In Jones v. S. D. Children's Home Soc., supra, testator was 85 years old when a will was executed in 1972, had suffered a stroke in 1964 which partially paralyzed him, and was moved to a nursing home in the winter of 1971. Testator did not remember much of what transpired in the winter of 1971. During this time, a petition was filed with the court to declare testator an incompetent, and a guardian was appointed of his estate. The trial court held testator competent and this court affirmed.
In its initial brief, contestant suggests that the appointment of a guardian of the estate of Podgursky[6] is conclusive of his *57 inability to execute a valid will under SDCL 27A-2-3. This section reads:
After his incapacity has been judicially determined, a person of unsound mind can make no conveyance or other contract, nor delegate any power, nor waive any right, until his restoration to capacity is judicially determined. If actually restored to capacity, he may make a will, though his restoration is not thus determined.
The words in the first sentence of that section do not include the bar of a will and the last sentence expressly authorizes the making of a will under the conditions there stated.
An early and interesting opinion by Justice Brown in Keely v. Moore, 196 U.S. 38, 25 S.Ct. 169, 49 L.Ed. 376 (1904) is in accord with the tenor of this statute, without it having been in effect. There the testator was committed to a private insane asylum as a lunatic upon the certificate of two physicians on December 15, 1885; on February 1, 1886, he was "granted a leave of absence on probation" and on February 24, 1886, he executed the challenged will. It was not until June 26, 1886, that a formal order of discharge from the asylum was entered. Two witnesses who were present at the execution of the will testified to testator's mental capacity at that time. "In addition to the proof of his commitment to the asylum, and of his undoubted insanity prior and for some time subsequent thereto," there was some evidence of insane acts during February of 1886. The whole testimony regarding his insanity was duly submitted to a jury, which under proper instructions found testator possessed of sufficient capacity to make a will. The judgment thereon was affirmed by the court of appeals and by the Supreme Court, which wrote, "Thomson may have been insane to the extent of being dangerous if set at liberty, and yet may have had sufficient mental capacity to make a will." 196 U.S. at 46, 25 S.Ct. at 172, 49 L.Ed. at 380.
The testimony of Dr. Herman must be viewed with at least two qualifications: First, the difference in the medical and legal use of the term "sanity" and, second, that while it was the opinion of an expert, it and all entries in the medical record remained opinions. There is a difference in the legal and medical use of the word "sanity." Sanity is not necessarily synonymous with the capacity to make a testamentary disposition. Stormon v. Weiss, N.D., 65 N.W.2d 475, 510. One may lack mental capacity to such an extent that according to medical science he is not of sound mind and memory, and nevertheless retain the mental capacity to execute a will. In re Graham's Estate, Sur., 63 N.Y.S.2d 572; Keely v. Moore, supra. This distinction was also voiced by the Wyoming Supreme Court when it wrote:
[T]he requirements of mental soundness in the legal sense, so as to constitute testamentary capacity, are not as rigid as those in a medical sense. A mind legally sound may be medically unsound. In re Johnston's Estate, 63 Wyo. 332, 348, 181 P.2d 611, 617.
As was said by the Supreme Court of California in In re Arnold's Estate, 16 Cal.2d 573, 585, 107 P.2d 25, 32:
It is well settled that mere proof of mental derangement or even of insanity in a medical sense is not sufficient to invalidate a will, but the contestant is required to go further and prove . . . such a complete mental degeneration as denotes utter incapacity to know and understand those things which the law prescribes as essential to the making of a will,. ..
See also Perkins v. Perkins, 116 Iowa 253, 90 N.W. 55; In re Bose's Estate, 136 Neb. 156, 285 N.W. 319; In re Heller's Estate, 233 Iowa 1356, 11 N.W.2d 586.
That the testimony of an expert is an opinion is discussed and decided in Smith v. State, 1972, 259 Ind. 187, 285 N.E.2d 275, 55 A.L.R.3d 546,[7] where the expert witnesses relied in part on two reports made by staff members of a state hospital and had personally *58 examined the defendant. (Dr. Herman relied wholly on such reports.) The court wrote:
Although medical reports containing observations and expert opinions relating to a defendant's sanity or insanity should not be admitted directly into evidence, they may be used to aid another expert in formulating his opinion as to the defendant's sanity. The function of an expert witness in a case concerning sanity or insanity is advisory in nature. He does not state a fact but gives an opinion in order to aid the jury or trier of fact. The trier of fact must make the ultimate decision on this issue. 285 N.E.2d 275-276.
A contention made that an expert's opinion in a will contest be given conclusive effect received this answer by the court in In re Wynne's Estate, 1966, 239 Cal.App.2d 369, 371, 48 Cal.Rptr. 656, 658:
Upon analysis, it appears that the underlying question to be determined on appeal is whether or not the trial judge was conclusively forced to accept the hypothetical opinion of a medical specialist, Dr. George N. Thompson of Los Angeles, who was called to the stand by the contestants,. . . Dr. Thompson stood alone in the record in his opinion that Mrs. Wynne could not have been in a mental condition to execute legally the codicil of March 30, 1962. We are of the opinion that there is no principle of law which would compel the trial judge to reject the testimony of the subscribing witnesses, and Mrs. Wynne's local doctor, and acquaintances, and to accept at its full face value the opinion of a specialist who never saw the decedent, and whose testimony was given in response to a hypothetical question. . . . [Quoting from a prior cited decision, citation omitted] `This kind of expert testimony, given under such circumstances, even the testimony of able and disinterested witnesses, as no doubt these were, is in the eye of the law of steadily decreasing value.'
Briefly summarizing the evidence, it appears all three witnesses for contestant were in its employ; that Dr. Herman had never examined Podgursky and had never seen him. His evidence consisted wholly of explanations of, and comments and qualified opinions based on, entries in the medical records made by other doctors, one entry of which is referred to as that doctor's "impression." No showing was made that the doctors who made entries as late as 1975 were not available as witnesses. VA social worker MacDonald, who last saw Podgursky in 1970, when he was better able to speak English and understand ordinary conversation, testified that Podgursky was "getting along pretty well then" and that he "appreciated the fact she had gotten him out of the VA hospital." VA attorney Ranney saw him twice, and in 1967 and on another date not definitely set, made written reports thereof; he read these two reports and reports made by other VA agents of their visits. These reports indicated that Podgursky had no desire to use his spending money, except that he once desired to buy a large easy chair, which was purchased and used by him; that he spent much time watching television and smoking cigarettes; that he used $20 a month spending money for cigarettes and snacks; that Mrs. Sorenson purchased candy and other items for his personal enjoyment and that he did considerable walking around town. On the part of proponents, the attesting witnesses were disinterested and their testimony, though subject to extensive and thorough cross-examination, was detailed, clear and definite, and supports the trial court's findings that Podgursky had the requisite testamentary capacity[8] at the time the will was executed; that he knew he was making a will and the consequences thereof. In accord with the reasoning of the authorities referred to herein, the findings cannot be set aside as "clearly erroneous" as required by SDCL 15-6-52(a) and In re Estate of Hobelsberger, supra.
Unlike the question of competency, the burden of proving undue influence is on *59 the contestant. Johnson v. Shaver, 1919, 41 S.D. 585, 172 N.W. 676; Jones v. S. D. Children's Home Soc., supra. Contestant contends the evidence reveals that Mrs. Sorenson occupied a confidential relationship with Podgursky, that as she made the appointment by telephone with attorney Hood, drove him to Hood's office for both meetings and as Sorensons never took the stand at the trial, they failed to meet the burden set down by this court in In re Estate of Anders, 1975, 88 S.D. 631, 637, 226 N.W.2d 170, 174, which is quoted as follows:
Where a confidential relationship is established, only the burden of going forward with evidence showing that he took no unfair advantage of the decedent shifts to the beneficiary.
The Anders opinion then follows this quotation by a statement of the essential elements of undue influence and
The burden of proof with respect to establishing the fact of undue influence is ordinarily placed on the contestants, and this burden is satisfied by a preponderance of the evidence. Johnson v. Shaver, supra. There was no evidence in the record that Thompson actually exerted any undue influence upon the decedent, and the trial court properly found that the appellants [contestants] had not carried their burden. 88 S.D. at 638, 226 N.W.2d at 174.
So here, there is no evidence in the record that undue influence was actually exerted by Sorensons, and none was claimed in contestant's "Complaint." The evidence is undisputed that the two conversations between Hood and Podgursky relative to, and the execution of, the will were held in private offices without the presence of Sorensons.
In Hobelsberger, supra, contestants similarly contended that the Ramls, to whom testator left all his property, had the motive and opportunity to exert undue influence on the testator as the Ramls asked their attorney to see him to draw the will. The court wrote, "there must be evidence they [Ramls] did exert such influence. . . . That the Ramls were provided for in the will and had an opportunity to influence him does not prove that they did." 85 S.D. at 290, 181 N.W.2d at 459. Returning to the Anders opinion, the court there stated:
[A]ppellants mistakenly conclude that the burden of proof on the issue of undue influence shifts to the proponent. Only the burden of going forward with a reasonable explanation of the [claimed] unnatural character of the will shifts to the proponent at this point. In this instance, Thompson did present a reasonable explanation to the trial court. He and the decedent had been friends . . .. 88 S.D. at 638, 226 N.W.2d at 174.
Podgursky told Hood that Sorensons had been good to him in the last seven or eight years of his life; that presented a reasonable explanation of his bequest to them. No presumption of undue influence is raised from the fact that the benefits received under a will were obtained by acts of kindness of the beneficiary. In re Estate of Hobelsberger, supra. See also In re Wynne's Estate, supra.
Of the two VA social workers who were witnesses for proponents, one, a home finder and visitor, testified that the Sorensons were "the best sponsors we ever had," and the other said that when Podgursky first came to the hospital they were "not aware he could speak English," but when she visited the Sorenson home in 1973 and 1974 he then spoke English, though slowly. This indicated his improvement. We have not overlooked the testimony that attorney Hood prepared and there was executed a will by veteran Timmel which bequeathed his property to the Sorensons. There was no evidence that the probate of that will was objected to or contested by the United States.
On our review of the issue of undue influence, the trial court's finding that Sorensons did not unduly influence testator cannot be set aside. Thus the judgment is affirmed.
WOLLMAN, C. J., and MORGAN, J., concur.
DUNN and ZASTROW, JJ., dissent.
BIEGELMEIER, Retired Justice, sitting for PORTER, J., disqualified.
*60 DUNN, Justice (dissenting).
While the majority opinion states the usual rules for upholding a will, it overlooks the fact that the respondents were hauling these mentally deficient people to a lawyer for the purpose of making wills in which the respondents were the sole beneficiaries. In this instance, two of these unfortunate people were taken at the same time! It strains the imagination to accept the testimony that these two men, acting independently, suddenly and simultaneously decided that making a will was an important step in their lives. We must remember that these respondents are dealing with exceptionally vulnerable people, and the usual rules for upholding or voiding a will have little significance. We should instead look to the evident fact that these poor people had no incentive for drawing a will except that supplied by their guardians. A few months of kind treatment (which they were entitled to in any event) makes these veterans putty in the hands of their guardians.
The respondents were in a strictly fiduciary relationship with the veterans entrusted to their care. They were being well paid for providing the comforts of life to these people in their declining years. They should not be permitted to manipulate these people for their own financial gain. Their actions shock my conscience, and this decision condones a practice that is not only unsavory but downright dangerous to a patient. It opens the door for all operators of foster homes for these unfortunates to follow a similar practice. It could well encourage the unscrupulous to enter this line of work for the sole purpose of reaping the harvest of bequests available upon the deaths of these veterans. When the termination of life becomes a matter of monetary gain for the guardians of these unfortunate people, the evil results of this program may well outweigh the good which inspired its creation by the Veterans' Administration.
I would reverse the judgment.
I am authorized to state that ZASTROW, J., joins in this dissent.
NOTES
[*] In accordance with SDCL 16-1-5.
[1] (e) Any funds in the hands of a fiduciary appointed by a State court or the Veterans' Administration derived from benefits payable under laws administered by the Veterans' Administration, which under the law of the State wherein the beneficiary had his last legal residence would escheat to the State, shall escheat to the United States . . ..
[2] It appears the estate of $36,520 consists in part of the balance of funds paid to Podgursky by the United States Veterans Administration (VA) based on evaluations of two VA doctors on January 5, 1965, and December 19, 1966, that granted him service connected disability from January 3, 1944. Dr. Herman testified: "Well, this (entry) was the one in which service connection is grantedit looks like to me. Since there had originally been an error (of 21 years), he was not originally compensated." The estate also included the balance of his social security payments; whether the latter is within the terms of 38 U.S.C.A. § 3202(e) is not material in view of our decision. The monthly payments ran from $300 to $655 (VA) and $70.70 to $139.90 social security.
[3] There appears to be some difference of opinion of psychiatrists on this subject. In an action in the District Court of the United States for the Middle District of Georgia in which Ellis E. Lake as guardian was plaintiff and ABC Corporation was defendant, Dr. Corbett H. Thigpen, Associate Professor of Psychiatry and Neurology of the Medical College of Georgia testified in a deposition as to the diagnosis of schizophrenia of a plaintiff as follows: "He could have been well of schizophrenia, though xx psychiatrists who trained years ago say `once a schizophrenic, always a schizophrenic.' I do not hold to that belief. Q. Do other psychiatrists agree with you on that? A. Oh yes, I think most of the present day psychiatrists have more or less dropped that idea. I have seen many of them get entirely well." Trauma, Vol. 4, No. 4, pp. 30-34.
[4] Dr. Herman's opinion on curing Podgursky's ailment is mentioned earlier in the opinion and commented on in footnote 3. He testified that based solely on VA medical records "I'd have no expectation of cure." In answer to a question: "Is it a curable disorder?" he answered, "That depends upon the definition of cure, to some extent, but for practical purposes, no."
[5] SDCL 15-6-52(a) provides in part that:

Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses.
[6] However, contestant-appellant's reply brief modifies this claim by writing: "Appellant wishes to make clear that it is not relying upon the fact of Podgursky's guardianship to establish the veteran's insanity or mental incompetence." See In re Blake's Estate, 1965, 81 S.D. 391, 136 N.W.2d 242.
[7] Cert. den. 409 U.S. 1129, 93 S.Ct. 951, 35 L.Ed.2d 261.
[8] In Jones v. S. D. Children's Home Soc., 1976, S.D., 238 N.W.2d 677, the court also noted that the test for capacity to contract for the sale of real property is somewhat different than the testamentary capacity to make a will.