In the Matter of the ESTATE OF Paul ZECH, Deceased.

No. 12506.

Supreme Court of South Dakota.

Argued March 16, 1979.

Decided Nov. 7, 1979.

Rehearing Denied Dec. 18, 1979.

Howard W. Paulson and Gary J. Pashby of Boyce, Murphy, McDowell & Greenfield, Sioux Falls, for opponents and appellants.

Francis C. Burns of Gribbin, Burns & Eide, Watertown, for proponent and respondent.

TICE, Circuit Judge.

This is an appeal from a judgment admitting a last will and testament dated June 16, 1970, executed by Paul Zech (deceased) into probate and the issuance of letters testamentary to Charles Tesch. The judgment appealed from was entered following a lengthy trial in which collateral heirs of decedent attempted to block entry of the will into probate on the basis of undue influence. We affirm.

## FACTS

Decedent passed away at Aberdeen, South Dakota, on April 15, 1977. He was at that time eighty-three years of age. Decedent had never been married and at the time of his death his four sisters and nine brothers were all deceased. Of the fourteen children in the Zech family only two married and left children. These children constitute the sole heirs at law of decedent. Charles Tesch, a child of decedent's predeceased sister Emma Tesch, together with his wife, are the proponents of the disputed last will and testament of decedent (referred to jointly as proponents). Emma's remaining children, brothers and sisters of Charles Tesch, namely, Albert Tesch, Arthur Tesch, John Tesch, and Lorraine Tesch (referred to jointly as contestants) objected to the admission of the June 16, 1970, instrument into probate as the last will and testament of Paul Zech. They contended that the will was the product of undue influence exerted by the proponents over decedent and that deceased was not competent to make a will on the date of execution.

For many years decedent resided with his sister, Alma Zech, at the ancestral home near Watertown, South Dakota. As Alma began to slip into senility the living conditions on the farm became intolerable. Accordingly, in September of 1966 decedent became a resident of Jenkins Memorial Home in Watertown, South Dakota. Following a brief stay at the State Hospital in Yankton, South Dakota, Alma joined decedent in the Jenkins Home.

Decedent and his sister were not happy about living in the Jenkins Home. In the spring of 1967, decedent offered to purchase a house in Watertown, South Dakota, for the proponents if Charles and his wife would agree to care for decedent and his sister throughout the remaining years of their lives. In addition, decedent offered to pay to the proponents an amount equal to what it was costing them to live at the Jenkins Memorial Home.

In May of 1967, decedent and his sister left the Jenkins Home and moved in with the proponents. Title to the property was conveyed by decedent to the proponents; however, decedent continued to pay taxes and insurance on the property. In addition, decedent paid the proponents $3,000 to $3,500 a year for his care. Decedent also purchased an automobile and a pickup for the proponents.

On July 17, 1967, Alma Zech passed away. Decedent continued to reside with the proponents. By all accounts this arrangement was an amicable one. Decedent received certain real property in lieu of a legacy from Alma's estate.

During August and September of 1968, two contracts for deed, covering the property decedent received from Alma, were made between decedent and the children of the proponents. These contracts were prepared by an attorney and were executed out of the presence of the proponents.

Mary Tesch testified that when decedent moved into the home of the proponents he indicated that he did not wish to make a will because he did not believe that wills were of any value. She further testified that while she did not speak to decedent specifically about his will they did have conversations about wills in general. At some point decedent apparently changed his mind concerning the efficacy of a will, and on November 9, 1968, Mary Tesch typed up a will for decedent according to his instructions. This document is very brief and was, if valid in the first place, revoked by the instrument now at issue. The general outlines of the 1968 instrument are similar to decedent's last will and testament at least insofar as the will results in the proponents receiving the bulk of decedent's worldly goods.

A few days prior to execution of the June 16, 1970, will Mary Tesch called O. E. Beardsley, formerly of Watertown, South Dakota, and asked Mr. Beardsley to come to the house to see decedent. Attorney Beardsley met alone with decedent. Decedent then told Mr. Beardsley that he wished to make a will and discussed with the attorney the extent and nature of his property, who his relatives were, and how he wished to dispose of his property. Mr. Beardsley then returned to his office and prepared the will. On June 16, 1970, Mr. Beardsley, accompanied by his law partner, returned to the residence for execution of the will. After decedent had read the document and Mr. Beardsley had discussed its provisions with him, decedent signed the will in the presence of Mr. Beardsley and his law partner, both of whom signed the document as witnesses. The attorneys testified that no one else was in the room when the will was executed, and they also testified that each of them believed the instrument to be an expression of decedent's free will and that decedent was competent to make a will at the time of execution.

During the next several years much of decedent's property was transferred to the Teschs. On July 19, 1971, a savings certificate registered to decedent was transferred to the proponents and was increased to $10,000. On April 4, 1973, the name of Alma Zech, (decedent's deceased sister), was removed from approximately $60,000 worth of decedent's Series H savings bonds, and Mary Tesch's name was added. Certificates

of deposit totaling approximately $13,500 were purchased between April 4, 1970, and July 29, 1974. These certificates were registered in joint-ownership between decedent and one of the proponents or one of their children.

Payments due under the contracts for deed between decedent and the proponents' children were forgiven by decedent for the year 1974. In 1975, Mary Tesch recorded a similar forgiveness of the amount due for that year without discussing the matter with decedent.

The proponents did not inform any other members of the family about the transfers of property and monies that decedent had made to them and their children.

Jerry Miller, trust officer of the bank in which decedent maintained a safety deposit box, testified concerning the April 4, 1973, transaction in which Alma Zech's name was deleted and Mary Tesch's name was added to the $60,000 worth of savings bonds. Mr. Miller explained to decedent the effect of having Mary's name added to the bond. He further testified that decedent was "adamant" about wanting Mary's name placed on the bonds. The trial court found that the acts whereby decedent transferred much of his property to the proponents following execution of the will indicated decedent's intention to carry out a disposition of his property in accordance with the disposition made in the will of June 16, 1970.

In June, 1975, the proponents moved decedent into a nursing home in Aberdeen, South Dakota. They apparently did not notify the other relatives that decedent had been moved to Aberdeen. It would, however, seem purposeless to have done so since no relatives had shown an interest in decedent for many years. On February 9, 1976, decedent was deemed no longer competent to manage his affairs and the bank in Watertown, South Dakota, was named financial conservator for decedent. Decedent remained in the Aberdeen nursing home until his death. The proponents frequently visited decedent during this period of time. It does not appear that any of the other relatives made any effort to locate or visit or even inquire about decedent during the final years of his life.

## BASIS OF REVIEW

In reviewing this matter we are mindful of the fact that findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses. SDCL 15–6–15(a); *In Re Estate of Hobelsberger*, 85 S.D. 282, 181 N.W.2d 455 (1970). In addition we must review the facts "in a light most favorable to the trial court's finding and all conflicts in the evidence [must be] resolved in its favor." *In Re Metz' Estate*, 78 S.D. 212, 214, 100 N.W.2d 393, 394 (1960). The function of this court is not to determine the weight of the testimony nor to decide whether any Justice of this court would have made a similar fact determination. This court can only ascertain whether there is evidence from which the trial court could properly have drawn its conclusion. *Estate of Podgursky*, 271 N.W.2d 52 (S.D.1978). As we said in *In Re Estate of Hobelsberger*, supra: "It was for the trial judge to select from the conflicting evidence that which he would believe. He, not this court, is the trier of the facts." 85 S.D. at 288, 181 N.W.2d at 458 (1970). In sum, then, it is not the function of this court to second-guess the trial court, but rather to insure that clear error occurring in the heat of trial is not allowed to deny justice to the parties bringing their causes before the court.

## ISSUE

The sole issue we must consider is whether the proponents exercised undue influence upon decedent in the making of his will. In reaching this determination, five factors must be evaluated:

(1) Were the proponents in a confidential relationship with decedent?

(2) Was decedent susceptible to undue influence?

(3) Did proponents have an opportunity to exert undue influence?

(4) Did the proponents have a disposition to exert undue influence?

(5) Does the will clearly show the effect of such influence?

## DECISION

### CONFIDENTIAL RELATIONSHIP

■ It is beyond argument that the proponents were in a confidential relationship with decedent. Mary Tesch assisted decedent with his business affairs during the time he lived with the proponents, although he made all decisions concerning his property. She prepared checks for his signature, wrote letters for him under her signature, made deposits and withdrawals from his savings accounts, had access to his safety deposit box, and discussed with him the price he would receive from her sons for his land. In addition, decedent relied entirely upon proponents for transportation and the daily necessities of life. As we said in *In Re Metz' Estate*, supra: "When a confidential relationship is established the burden of 'going forward with the evidence' shifts to the beneficiary to show that he took no unfair advantage of his dominant position." 78 S.D. at 222, 100 N.W.2d at 398. The burden of going forward with a reasonable explanation must be distinguished from the burden of proof. As we said in *Estate of Anders*, 88 S.D. 631, 637–638, 226 N.W.2d 170, 174 (1975):

> Where a confidential relationship is established, only the burden of going forward with the evidence showing that he took no unfair advantage of the decedent shifts to the beneficiary. . . .

> The burden *of proof* with respect to establishing *the fact of undue influence is ordinarily placed on the contestants* . . . . (emphasis supplied)

In the present case the proponents went forward with evidence showing that there was a rational explanation for the disposition of decedent's property. Proponents initially established that the terms of the will were discussed with Attorney O. E. Beardsley out of their presence and without any participation on their part whatsoever, and that the will was ultimately signed a few days later, also outside their presence and without their participation. In rebuttal it was shown that when decedent's situation on the farm and later in the Jenkins Memorial Home had become undesirable to decedent, they agreed to provide care and companionship for decedent and his sister for the remaining years of their lives. The record clearly shows that the proponents undertook no small burden when they agreed to do this. Decedent's sister, Alma, was a very difficult person to deal with. While living on the farm prior to her commitment to Yankton, she had developed many bizarre habits, including wearing many layers of clothing, refusing to eat, refusing to use a bathroom, scattering her feces about the house, setting fires, and refusing to eat nourishing food. While it is true that Alma lived with the proponents for only a short time, there was no way that the proponents could have known this when they made the commitment to care for the elderly pair. Decedent was deeply devoted to his sister and it is not unreasonable that he would show much gratitude to the persons who agreed to make it possible for him and his sister to live in a homelike atmosphere that cannot be found in an old people's home. The proponents took care of decedent in this environment for ten years. During this period of time the contestants and the other relatives of decedent had only minimal contact with decedent. Indeed, the only visit set out in any detail in the record by any of the contestants was an occasion in which one of the contestants attempted to get decedent to give away some of his property.

The proponents took decedent to an intensive care nursing home in Aberdeen in 1975. They continued to see decedent frequently, driving many miles to do so, even after he was judicially declared incompetent and there was no way in which they would be able to profit from this contact monetarily, which negates the suggestion that they were only after his money. The record also shows that decedent fell and broke his hip in 1974 and that subsequently he required more care than the proponents

were able to give him. There was no evidence that decedent objected to living in the Aberdeen nursing home. In fact, the record shows that none of the contestants or the other relatives attempted to visit decedent during this time. In view of the foregoing it is clear that the proponents met their burden of going forward with the evidence to show that they took no unfair advantage of decedent. *In Re Estate of Anders*, supra; *Estate of Podgursky*, supra.

We now turn our attention to the elements of undue influence that contestants were required to prove by a preponderance of the evidence, unaided by any effect of the confidential relationship. In *In Re Metz' Estate*, supra, this court said:

> Influence, to be undue, must be of such character as to destroy the free agency of the testator and substitute the will of another person for his own. *In re Armstrong's Estate*, 65 S.D. 233, 272 N.W. 799 [1937]. Its essential elements are (1) a person susceptible to such influence, (2) opportunity to exert such influence and effect the wrongful purpose, (3) a disposition to do so for an improper purpose, and (4) a result clearly showing the effect of such influence. *In re Rowland's Estate*, 70 S.D. 419, 18 N.W.2d 290 [1945].

78 S.D. at 214–215, 100 N.W.2d at 394.

## SUSCEPTIBILITY TO INFLUENCE

First, contestants failed to establish that decedent was a person susceptible to such influence. To the contrary, the record shows that during the time period in which the will was executed decedent was, according to a next-door neighbor who spoke to decedent nearly every day, a man aware of what was going on about him, with definite opinions about farming, politics, and farm markets. Another witness, for whom Mary Tesch babysat, testified that she was aware that her infant was sometimes left in decedent's care. She was not bothered about this because she found decedent to be "a fine and friendly and relatively alert old man." It was testified by Carl Tesch that decedent was very sharp at and assisted him with algebra and geometry. The attorneys who witnessed the execution of the will testified that decedent met all of the legal requirements for a testator, including not acting under menace, duress, undue influence, or misrepresentation. In addition, the banker who assisted decedent in changing the title to his government bonds testified on cross-examination that decedent was "adamant" about the disposition of his property and was specific about which bonds he wished changed and which he did not. This evidence does not present a dark picture of coercion, threat, and intimidation such as is found in the *Metz* case, supra.

## OPPORTUNITY TO EXERT INFLUENCE

It is clear that the proponents had a very close relationship with decedent, and spent much time with him, however, they were never present during, nor in any way a party to, the discussions with the decedent and his counsel in the preparation or execution of the will. While their relationship with decedent created a certain opportunity to exert influence over him, we have held that "opportunity alone is not sufficient to warrant an inference of undue influence." *Peterson v. Imbsen*, 46 S.D. 540, 543, 194 N.W. 842, 843 (1923). In a similar vein this court said in *In Re Hosmer's Estate*, 47 S.D. 147, 150, 196 N.W. 545, 546 (1924):

> The [trier of fact] may have understood that [it] might infer undue influence from the fact that [proponent] had an opportunity to influence the testatrix, that he was made a beneficiary of the will, and that he showed a disposition to retain the benefits of the will. These facts do not amount to proof of undue influence. If they did nearly every will could be set aside on this ground . . . .

The fact that proponents were the only relatives of decedent who showed an interest in him in his later years and provided for him on a daily basis obviously establishes the opportunity to exert influence, but it does not establish the exertion of undue influence, and indeed such conduct is to be commended rather than used as a basis to deny decedent's expressed desire to reward such human concern.

## DISPOSITION TO EXERT INFLUENCE

Contestants did not establish that proponents were of a disposition to exert undue influence for an improper purpose. In their briefs and in argument before this court the contestants repeatedly emphasized the transfers of money and property made by decedent to the proponents and members of their family. Nearly all of these transactions occurred subsequent to execution of the will and would indicate a concerted purpose to carry out the intent of that will *inter vivos*. The trial court found that decedent intended by these independent acts to grant the bounty he intended to bestow upon his death to the proponents while he was living. As stated earlier, we are to take the inferences in a manner that tends to support the determination made by the trial court.

While the contracts for deed executed by decedent and the sons of the proponents were made prior to the execution of the will, the price recited in these contracts was virtually the same price decedent had paid for the land less than one year prior to execution of the contract when he took the property as his share of his sister Alma's estate. That valuation had been placed on the land by disinterested appraisers appointed by the executor of Alma's estate. There is no evidence of any cold and calculating plot on the part of the proponents to cajole, coerce, or subtly acquire decedent's estate. Indeed, Phyllis Jacobson testified that Mary Tesch had tears in her eyes when she showed Mrs. Jacobson the savings certificate that decedent had signed over to her. Accordingly, we hold that the contestants failed to establish the element of disposition on the part of the proponents to unduly influence decedent for an improper purpose.

## WILL SHOWING THE EFFECT OF INFLUENCE.

The final element to be considered is whether the will clearly shows the effect of undue influence. It can not be disputed that the proponents stand to benefit handsomely under the terms of decedent's will. Had contestants successfully established the other elements of undue influence, this final element would be the capstone necessary to establish a successful challenge to the will. In the present case, the contestants have failed to establish the necessary prerequisites that would cast the disposition of decedent's property in an unfavorable light. In view of that failure we must conclude that decedent was appreciative of the many acts of kindness shown to him by the proponents and that he wished to reward them for this behavior. This appropriate motivation of decedent, coupled with contestants' total disregard of decedent in the final years of his life, does not substantiate the evil intent ascribed to this disposition by the contestants. As we said in *In Re Blake's Estate*, 81 S.D. 391, 398, 136 N.W.2d 242, 246 (1965):

A testator has the privilege and right to dispose of his property as he chooses within limits and in the manner fixed by statute. The law does not require that he recognize his relatives equally or at all.

The language used by this court in *In Re Swanson's Estate*, 54 S.D. 42, 45, 222 N.W. 491, 492 (1928), is appropriate here:

To hold that the will involved in this case was procured by undue influence amounts to a holding that a son or a daughter [or other relative] who is given preference in a will has exerted undue influence by the mere act of remaining with aged parents, and, at a cost of self-sacrifice, aiding them and caring for them until their infirmities end in death. To that extent neither this court nor courts generally have seen fit to go.

Accordingly, the judgment of the trial court must be affirmed.

WOLLMAN, C. J., and MORGAN, J., concur.

DUNN and HENDERSON, JJ., dissent.

TICE, Circuit Judge, sitting for FOSHEIM, J., disqualified.

HENDERSON, Justice (dissenting).

This action involves the contest of a will executed by Paul Zech, deceased, on the 16th day of June, 1970, at Watertown,

South Dakota. The circuit court admitted it to probate. Under its terms Charles and Mary Tesch inherit the bulk of decedent's estate. Three other nephews and one niece appeal. I would reverse.

Paul Zech was the youngest of fourteen Zech children and the last child in the family to survive. He passed on at the age of eighty-three years at Aberdeen, South Dakota, on April 15, 1977. He was a life-long epileptic and never married. At the age of fifty, Paul Zech retired from active farming and did yard work around the farm. Paul Zech remained on the family farm with his sister, Alma. Their living conditions, however, were absolutely appalling. Neither Paul nor Alma was able to cook, food was left out to spoil, and Alma used the dining room as a bathroom, forcing decedent to sweep the excrement out the door.

Alma was committed to the State Hospital at Yankton, South Dakota, in December, 1965, for one month. Paul then took up residency with his nephew and wife, Carl and Letha Rau, as he was physically unable to fend for himself on the farm. He lived there from December, 1965, until September 1, 1966, when, because of Letha Rau's ill health, he was moved to the Jenkins Nursing Home in Watertown, South Dakota, where his sister Alma was residing.

Charles and Mary Tesch began regularly visiting Paul at the Jenkins Nursing Home as many as three and four times a week and for several hours at a time. Noting the general unhappiness of Paul and Alma Zech, Mary Tesch suggested a house be purchased in Watertown, South Dakota, where she and Paul's nephew, Charles Tesch, could care for both of them. After frequent visitations, an arrangement was struck whereby Paul Zech was to purchase a home in Watertown and pay the yearly real estate taxes and insurance. Mary Tesch selected the home, which Paul Zech bought. The arrangement, although loose and not committed to writing, included that Charles and Mary Tesch were to live with Paul and Alma Zech rent free and generally attend to their needs. Charles and Mary Tesch were to receive the sum of $500 per month, which represented the amount of money that it was costing Paul and Alma Zech to live in the Jenkins Nursing Home. The record substantiates the decedent's payment of the yearly real estate taxes and insurance; however, the record is unclear as to the decedent's monthly payment of $500 due to a failure in keeping records. The decedent, however, substantially complied.

From the latter part of May, 1967, to June, 1975, Charles and Mary Tesch resided in the same household as Paul Zech. The record discloses that Paul was dependent upon them for all of his basic needs. During the time decedent lived with the Teschs, he was in extremely poor physical health. He suffered from severe arthritis, epilepsy that had brought on eleven grand mal seizures from 1946 to 1966, arteriosclerosis, cataracts, and elimination problems. He had great difficulty in walking and it was necessary that someone cook his meals, make his bed, do his laundry, buy his medicine, and drive his automobile. He could not conduct his business and financial affairs without aid. During the late summer or early fall of 1973, while the decedent lived with Charles and Mary Tesch, Mary Tesch tied Paul in bed so that she was able to attend a ladies' aid meeting.

During the time that Paul Zech lived with Charles and Mary Tesch in the same household, Charles and Mary Tesch dominated and controlled Paul to such extent, that in addition to the fruits of the above arrangement, they were able to induce Paul Zech to:

(1) Convey the $19,000 home to them within one month after living with them;

(2) Purchase an automobile which was placed in joint ownership with Charles and Mary Tesch and purchase a pickup truck placed in the sole ownership of Charles Tesch;

(3) Place their names as joint owners on a $10,000 savings certificate purchased with his money on July 6, 1971;

(4) Designate Mary Tesch as beneficiary of $60,000 in Series H United States Government Bonds;

(5) Designate Charles, Mary or Carl (their son) Tesch as joint owners of $13,500 in certificates of deposit purchased with Paul Zech's money, which was accomplished in a time frame from April 4, 1970 to July 29, 1974;

(6) Name Mary Tesch as a joint owner of a savings account that she opened with Paul Zech's money on November 7, 1974, and unilaterally closed on March 11, 1976;

(7) Add Mary Tesch's name to Paul Zech's checking and savings accounts with a balance of $6,400 in February, 1976;

(8) Enter into two contracts for deed with their two sons, Dennis Tesch and Kenneth Tesch, for a combined sale of 400 acres. By Mary Tesch's own admission, the sons had little contact with Paul Zech before he entered the home to live with them and the sons came to the home and visited Paul Zech frequently thereafter.

On August 9, 1968, Paul Zech sold 240 acres to Dennis and Dorothy Tesch for $24,000 at 5% interest, with a $100 down payment and annual installments of $1,000 each. On September 3, 1968, Paul Zech sold 160 acres to Kenneth and Bernadine Tesch for $16,000 at 5% interest, with a $100 down payment and annual payments of $750 each year. On June 10, 1971, Mary Tesch recorded forgiveness of $5,000 on each contract for deed and then added her same as assignee of the contract for deed upon the death of Paul Zech. It further appears that the 1971, 1974, and 1975, yearly payments on each of the contracts were all noted as being forgiven by personal notations of Mary Tesch. Although she testified that the payments were deposited in Paul Zech's account, the bank statements contained no entries corresponding with the several payments purportedly made on the contracts for deed.

As a part of the probate, both sons of Charles and Mary Tesch petitioned the court to complete the sale on the two contracts for deed. Due to this appeal, these petitions have not been judicially acted upon.

Prior to moving into the home with Charles and Mary Tesch, Paul Zech had expressed his belief that his nieces and nephews should be treated equally in the distribution of his estate which was in apparent keeping with the Zech tradition. Paul Zech had refused to consider an inquiry about the sale of his land and had responded by declaring that the land would be left for his survivors to share. Paul Zech was adamant about not wanting the Zech family farm land sold. Under Charles and Mary Tesch's domination, however, it was sold to their sons. It was Mary Tesch, not Paul Zech, who personally wrote to a tenant expressing that the land would not be rented any longer because it had been sold. It was she who called another tenant informing him that her sons would have the land next year. During the time that Paul Zech and the Teschs were living together, Paul Zech, in a conversation in a Watertown bar, asked one Casper Henrichs to farm his 240 acres. Charles Tesch broke into the conversation and told Casper Henrichs to "mind his own damn business." In another conversation, Charles told Bert Tesch (in referring to decedent) that "I don't think the s.o.b. will ever die," and "I'm going to inherit a kingdom."

Charles Tesch testified that he had told Paul Zech that $100 per acre was a good price for the land considering the shape the land was in. Charles Tesch also admitted that he had talked to decedent about the purchase and sale of his land a few times. Considering the totality of the land sale, i. e., decedent's expressions that he did not want to sell the land, the meager down payment and very liberal terms on a questionable price, it emerges that as early as the fall of 1968, Paul Zech's mind was not in an open and free state to act independently and his free agency had been destroyed.

Mary Tesch admitted that she and her husband, Charles, stood in a confidential relationship with Paul Zech and aided and helped him in his business and financial affairs; she also admitted, however, that she kept no financial records of decedent's business. Called upon to prove payments

and to account for the money of Paul Zech, Mary Tesch indicated that Paul Zech had a habit of destroying his checks, receipts, grain receipts, and that he kept his business in his head.

Mary Tesch was deeply involved in the preparation and execution of a will by Paul Zech dated November 9, 1968. In fact, Mary Tesch wrote this will for the decedent in longhand and then later typed it on a typewriter at home. The decedent executed this 1968 will in the living room of the home he occupied with Mary Tesch then present. Under this will, Charles and Mary Tesch were the principal benefactors. The will opponents introduced evidence that Paul Zech had previously indicated he was not in favor of having a will and he felt that the property should go equally to his relatives. Paul Zech had, prior to living with Charles and Mary Tesch, expressed his general opposition to wills and had told Mary Tesch that a will was no good anyway. Mary Tesch did not tell anyone about this 1968 will. She later took the position that the will was not valid as it had not been prepared by an attorney.

Mary Tesch testified that "after certain conditions" the decedent changed his mind about wills. The June 16, 1970, will should be considered in the light of this revealing testimony. The decedent had a severe epileptic seizure on June 6, 1970, during the time that he was living with Charles and Mary Tesch. He was unconscious for several hours. He remained hospitalized from June 6 to June 9, 1970. Seven days after being released, decedent executed his second will. During this time, however, it was later discovered that the dosage of medication prescribed for him was too strong. Furthermore, it was Mary Tesch who called a Watertown attorney, supposedly pursuant to decedent's request, to prepare decedent's will which again left the bulk of his estate to Charles and Mary Tesch. The discussion and execution of this will all took place in the common home occupied by the Teschs and Paul Zech.

The record reflects that not only was the decedent in a weakened condition because of this severe epileptic seizure but that he still suffered from poor health such as arthritis, arteriosclerosis, poor eyesight, and elimination problems. At the time of the making of the second will, he not only could not live alone but was still unable to fend for himself. In fact, he was totally dependent upon the Teschs to furnish him the very basics of life.

Although Charles and Mary Tesch had access to Paul Zech and participated in discussions with him regarding his will, the record reflects the other nephews and nieces did not. Mary Tesch maintains that she only did Paul Zech's writing and acted as his chauffeur but the record simply does not bear this out. Mary Tesch also admitted that she and her husband used decedent's money for their personal expenses during a nine-month period after he had moved to the Aberdeen nursing home. On numerous occasions, she entered Paul Zech's safety deposit box on her own signature. She had access to all of his cash, checks, checking accounts, savings accounts and bonds without power of attorney.

In the eight years that Charles and Mary Tesch lived in the same household with Paul Zech, acting in a confidential, if not fiduciary capacity, they and their two sons unduly profited from that relationship by acquiring a great amount of Paul Zech's personal property and land. There is overwhelming evidence that they appropriated for their use and benefit decedent's property throughout the course of years. As a vivid example, Charles and Mary Tesch both conceded that the decedent had virtually lost his mind subsequent to breaking his hip in October, 1974. Yet, it was after this, that Mary Tesch on her own volition forgave the 1975 payments on the land in question.

This case boils down to only one issue: Did Charles and Mary Tesch exert undue influence on decedent? The standard of review to be applied in this instance is the "clearly erroneous" standard. This court has adopted language used by the United States Supreme Court in construing the "clearly erroneous standard" as follows: "A

finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *In Re Estate of Shabley*, 85 S.D. 692, 695, 189 N.W.2d 460, 461 (1971). I am firmly and definitely convinced that the trial court's findings are clearly erroneous and that a mistake has been committed.

The four elements that together constitute undue influence are: "(1) a person susceptible to such influence, (2) opportunity to exert such influence and effect the wrongful purpose, (3) a disposition to do so for an improper purpose, and (4) a result clearly showing the effect of such influence." *In Re Estate of Melcher*, 89 S.D. 253, 259, 232 N.W.2d 442, 446 (1975).

The majority opinion concedes that the proponents of the will were in a confidential relationship with decedent. Once a confidential relationship is established between the testator and beneficiary, the burden of going forward with the evidence shifts to the beneficiary to show that he took no unfair advantage of his dominate position. *In Re Metz' Estate*, 78 S.D. 212, 100 N.W.2d 393 (1960). The proponents did not meet their burden as indicated by the evidence adduced at trial. Indeed, unfair advantage was taken and undue influence was exerted by proponents upon decedent. These conclusions are supported by examining the four elements of undue influence. Since the majority opinion concedes the existence of one element, the opportunity to exert undue influence, it is only necessary to examine the evidence in relation to the other three to show that undue influence was exercised on decedent.

The record reflects that Paul Zech was a person very susceptible to influence. In describing decedent, witnesses spoke of him as being "timid," "easily influenced," "never caused any problems," "wanted to please people," "would agree with people when they talked to him," "would agree with them one day and if somebody came the next day and presented a different thought, he would agree with them and would avoid a confrontation if possible," and "needed assistance, baby of the family, his brothers told him what was what, needed guidance pretty much."

Several instances were cited by witnesses which reveal decedent's susceptibility. For example, when his sister Alma used their dining room as a bathroom, decedent offered no resistance. Decedent became a victim of some fly-by-night repairmen who convinced him that the roof of his farmhouse needed treatment. Decedent paid a large sum of money for the unnecessary work, but he was afraid to complain to authorities because he feared that "they will come back and burn down the barn." In addition, a neighbor of decedent's had to talk him out of having the same repairmen make questionable repairs on the barn's lightning rods. Furthermore, decedent was seriously considering giving his barn to the County Historical Society to use as a museum, and was engaged in conversation to that effect when Mary Tesch walked into the room and said, "We ain't going to do anything with that old barn, are we Paul?" Decedent responded, "Nope." Mary went on to say "that barn is going to stay right where it is, isn't it, Paul?" Paul replied, "Yup."

Susceptibility to influence is also apparent when decedent's previous statements and declarations are examined. Decedent had made numerous statements to many people regarding his distaste and distrust of wills and his opposition to the sale of his land. Yet, within a relatively short time after living with proponents, he suddenly executed a will, prepared by Mary Tesch, leaving the bulk of his estate to proponents, and had executed contracts for deed to proponents' two sons. Finally, decedent subscribed to the traditional family practice of treating all relatives alike, both in *inter vivos* transactions and in testamentary dispositions. Each Christmas, decedent would give the same amount to members of the Tesch family. The terms of the will contradict this avowed practice.

This court has often placed considerable emphasis upon evidence that the intent of

the decedent was not carried out. In *Johnson v. Shaver*, 41 S.D. 585, 595, 172 N.W. 676, 678 (1919), this court stated: "Declaration of testator made previous to the execution of the will, and indicating a purpose inconsistent with the provisions thereof, 'is competent and relevant, in connection with other evidence, as tending to show susceptibility to undue influence.'" All of the above examples are weight to that effect.

The importance of physical and mental health in determining susceptibility to undue influence was recognized by this court in the *Metz'* case. In *Metz'*, at 100 N.W.2d 398, it was observed that:

> Susceptibility to influence does not mean mental or testamentary incapacity. In fact, the application of undue influence presupposes mental competency. . . However, "physical and mental weakness is always material upon the question of undue influence." . . . Obviously, an aged and infirm person with impaired mental faculties would be more susceptible to influence than a mentally alert younger person in good health."

Decedent was not in good health. In fact, when decedent supposedly asked Mary Tesch to call an attorney to make a valid will in June of 1970, he had been discharged from the hospital only a day or two before and was taking dilantin to combat the seizure's effects. In addition, his doctor testified that both grand mal seizures and arteriosclerosis may produce mental changes and deterioration over a period of time. Decedent's seizures began in 1948.

The only substantial evidence proffered by proponents was to the effect that decedent was competent. Competence, however, does not preclude a finding of undue influence; in fact, without proof of competence, undue influence is not possible. Hence, testimony as a whole painted a picture of a man who was competent, but because of various circumstances outlined above, was malleable and easily led. He was a perfect target for undue influence.

In the *Metz'* case, we stated that "disposition to unduly influence . . . for an improper purpose is . . . evident from . . . persistent efforts to gain control and possession of testator's property." 100 N.W.2d at 398. The proponents' successful efforts in obtaining control of and title to decedent's property during this time he lived with them warrants a finding that the proponents had the disposition to exert undue influence upon decedent for an improper purpose.

It was brought out at trial that proponents had earlier attempted to receive 320 acres of land from the estate of Dorothy Zech on the strength of statements contained in a Christmas card. This court in *In Re Zech's Estate*, 70 S.D. 622, 20 N.W.2d 229 (1945), affirmed a judgment against Charles and Mary Tesch in that matter. Additionally, a disinterested witness, a legal secretary present when Alma Zech's will was admitted to probate, testified that Mary Tesch was disgusted and upset when the will was read. Alma's will distributed her estate to her survivors in fairly equal amounts. These actions further substantiate proponents' disposition toward exercising undue influence.

The resultant effect of proponents' influence is clearly demonstrated by the fact that under the arrangements, which they were instrumental in devising, proponents or members of their immediate family stood to receive the bulk of decedent's estate. The terms of the will dated June 16, 1970, would give decedent's other nephews and nieces about $2,000 each, amounting collectively to about $21,000. This contradicts decedent's belief, both avowed and substantiated in practice, that his relatives should be treated equally.

There was no reason for decedent to change his mind to benefit proponents to the nearly total exclusion of his other relatives. Although proponents attempted to establish that decedent's other relatives forgot about him when he began living with proponents, there is a good deal of testimony that many of his relatives made reasonable efforts to communicate with him. Furthermore, there is testimony that proponents informed decedent's relatives, either implicitly or explicitly, that they did not

appreciate visits or calls regarding the decedent and preferred to have decedent left alone.

I would conclude that upon the basis of all the facts presented the proponents exercised undue influence upon the decedent. When he was most seriously ill in June of 1970, proponents saw the need for a will drawn by an attorney to insure its validity. When decedent lived on, proponents began exercising their influence to effectuate the terms of the will *inter vivos.*

While the courts have generally been sympathetic to those who provide care for an aged person, the proponents were not the Good Samaritans they portrayed themselves to be. Rather, they were guilty of overreaching in their efforts to gain complete control and ownership of the decedent's property.

I would reverse.

I am authorized to state that Justice DUNN joins in this dissent.